IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-02409-RPM

RE/MAX, LLC,

      Plaintiff,

v.

MICHAEL A. VALE,

      Defendant.

---

## ORDER OF JUDGMENT AND PERMANENT INJUNCTION

Upon the Court's review of the parties' Joint Motion for Entry of Judgment, and the pleadings filed herein, it is **ORDERED, ADJUDGED, AND DECREED** that:

1. For purposes of this Order, the franchise agreement dated January 1, 2008 and attached at **Exhibit 1** is referred to as the "New Franchise Agreement."

2. Surviving portions of the New Franchise Agreement, including but not limited to Section 14 ("Rights and Obligations of RE/MAX Regional and Franchise Owner Upon Termination or Expiration of the Franchise"), are incorporated into this Order.

3. The term "RE/MAX Marks" refers to the RE/MAX and REMAX word marks, the red-over-white-over-blue design, and the balloon marks. (*See* United States Trademark Registration Nos. 1,139,014; 1,702,048; 1,173,586; 1,339,510; 1,358,422; 1,691,854; 1,720,592; 1,900,865; 1,902,943; 1,902,982; 1,908,724; 2,054,698; 2,106,387; 2,119,607; and 2,403,626, certificates of registration for each attached as **Exhibit 2**).

4. Judgment is entered against Defendant for cybersquatting under 15 U.S.C. § 1125(d) (Count I), trademark counterfeiting under 15 U.S.C. § 1114 (Count II), trademark

infringement under 15 U.S.C. § 1114 (Count III), unfair competition under 15 U.S.C. § 1125(a) (Count IV), unfair competition under Colorado common law (Count V), and breach of contract under Colorado common law (Count VI).

5. Effective immediately, Defendant, and any of his agents, employees, successors and/or assigns, and all those in privity, acting in concert, or participation with him are permanently enjoined from:

  a. further breaching the New Franchise Agreement, including, without limitation, by using the RE/MAX Marks;

  b. imitating, copying, duplicating, manufacturing, producing, circulating, or otherwise making any use of the RE/MAX Marks or any mark confusingly similar to the RE/MAX Marks;

  c. using any unauthorized copy or colorable imitation of the RE/MAX Marks, or false designation of origin or description, in such fashion as is likely to relate or connect Defendant with RE/MAX or cause confusion;

  d. registering or attempting to register or using in any way any Internet domain name incorporating any of the RE/MAX Marks, or any mark confusingly similar to any of the RE/MAX Marks;

  e. engaging in any other activity constituting unfair competition or infringement of the RE/MAX Marks or RE/MAX's rights in, or to use, or to exploit the same; and

  f. assisting, aiding, or abetting another person or business entity in engaging or performing any of the activities enumerated in paragraphs (a)–(e) above.

6. Defendant and his agents, employees, successors and/or assigns, and all those in privity, acting in concert, or participation with him who receive actual notice of this Order are further **ORDERED** to deliver up, or, at RE/MAX's election certify the destruction of, all signs, articles, promotional, advertising, and any other printed materials of any kind bearing the RE/MAX Marks, and any mark confusingly similar to the RE/MAX Marks.

7. Defendant is **ORDERED** to pay damages in the amount of $15,000.00 to RE/MAX within fifteen (15) days of the date of this order.

IT IS SO ORDERED.

Dated: January _14_, 2015

BY THE COURT:

Richard P. Matsch, Senior District Judge

Civil Action No.   13-cv-02409-RPM

CERTIFICATE OF SERVICE

I do hereby certify that I have mailed a copy of the attached to the following:

Dated: <u>January 14, 2015</u>

JEFFREY P. COLWELL, CLERK

By <u>Kathy Terasaki</u>
      Deputy Clerk

Michael A. Vale
847 North Collier Boulevard
Marco Island, FL  34145

**EXHIBIT 1**

## TRANSFER AGREEMENT

**THIS AGREEMENT** is entered into and effective this <u>1st</u> day of <u>January</u>, 20<u>08</u> by and between <u>Results Realty of Collier County, Inc.</u>, whose address is <u>847 North Collier Boulevard, Marco Island, FL 34145</u> (hereinafter referred to as "Transferor"), <u>847 Realty Services, Inc.</u>, whose address is <u>847 North Collier Boulevard, Marco Island, FL 34145</u> (hereinafter referred to as "Transferee") and <u>RE/MAX Florida Region</u> (hereinafter referred to as "RE/MAX").

**WHEREAS**, on the <u>22nd</u> day of <u>February</u>, <u>2006</u>, Transferor entered into a Franchise Agreement (the "Franchise Agreement") with RE/MAX whereby Transferor was given the right to establish a RE/MAX real estate office using the RE/MAX System, the RE/MAX name, service marks, logos, slogans and other commercial symbols exclusively at the following location: <u>847 North Collier Boulevard, Marco Island, FL 34145</u> (the "Protected Location"); and

**WHEREAS**, Transferor desires to transfer the franchise rights granted pursuant to the Franchise Agreement and Transferee desires to acquire such franchise rights; and

**WHEREAS**, Transferee has agreed to enter into a new franchise agreement and RE/MAX has agreed to permit the transfer of the franchise to Transferee and to accept Transferee as substituted Franchisee upon condition of the payment by Transferor to RE/MAX of a transfer fee and the execution by Transferee of a new franchise agreement in the form being used at the time of the transfer (hereinafter referred to as the "New Franchise Agreement").

**NOW, THEREFORE**, in consideration of the mutual promises set forth herein, the parties do hereby agree as follows:

1.      Transferor hereby relinquishes all right, title and interest to the Protected Location and the franchise created by the Franchise Agreement and assigns and transfers all such right, title and interest to Transferee.

2.      RE/MAX hereby approves such assignment and transfer to Transferee upon the condition that (a) Transferor pays to RE/MAX, upon execution of this Agreement, a transfer fee in the amount of $2,000.00 and (b) Transferee executes the New Franchise Agreement designating Transferee as the new franchisee.

3.      RE/MAX and Transferor mutually agree that the provisions of Sections 4, 5 and 14 of the Franchise Agreement, which paragraphs relate to Transferor's ongoing obligations to RE/MAX subsequent to termination of the Franchise Agreement, shall survive the Franchise Agreement and this Agreement and shall be enforceable against Transferor by RE/MAX.

4.      RE/MAX and Transferor agree that this Agreement terminates the Franchise Agreement and their business relationship, and, except as otherwise provided

in Paragraph 3 above, they further unconditionally release each other from any and all claims, disputes, damages or liabilities of any kind or nature which either party ever had, now has or in the future may have against the other which arises out of or is in any way related to the Franchise Agreement or the relationship created thereby.

5.      Transferor agrees to pay reasonable attorneys' fees and court costs incurred by RE/MAX in the event that legal action is necessary to enforce any of the provisions of Paragraph 3 of this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed this Transfer Agreement as of the day and year first above written.

Results Realty of Collier County, Inc.

Daniel J. Dufault

847 Realty Services, Inc.

Michael A. Vale

RE/MAX Florida Region

By:
Nick Bailey
Regional Vice President

# RE/MAX FLORIDA REGION

# FRANCHISE AGREEMENT

RE/MAX Florida/FA
July 2007

## TABLE OF CONTENTS

| SECTION | | PAGE |
|---|---|---|
| 1. | INTRODUCTION | 1 |
| 2. | GRANT AND RENEWAL OF FRANCHISE | 2 |
| | A. GRANT AND TERM OF FRANCHISE | 2 |
| | B. FULL TERM PERFORMANCE | 3 |
| | C. LOCATION OF OFFICE | 3 |
| | D. RESERVATION OF RIGHTS | 3 |
| | E. RENEWAL OF FRANCHISE | 4 |
| | F. SATELLITE OFFICES | 5 |
| 3. | OPENING AND EQUIPPING OF OFFICE | 5 |
| 4. | LIMITED LICENSE TO USE RE/MAX MARKS | 6 |
| | A. OWNERSHIP AND GOODWILL AND LIMITED LICENSE | 7 |
| | B. SPECIFIC LIMITATIONS ON LICENSE TO USE RE/MAX MARKS | 8 |
| | C. NOTIFICATION OF INFRINGEMENTS AND CLAIMS | 12 |
| | D. DISCONTINUANCE OF USE OF RE/MAX MARKS | 12 |
| 5. | RELATIONSHIP OF THE PARTIES; INDEMNIFICATION | 12 |
| | A. INDEPENDENT CONTRACTOR; NO FIDUCIARY RELATIONSHIP; INDEPENDENTLY OWNED AND OPERATED | 12 |
| | B. CONDUCT OF BUSINESS OF THE OFFICE | 12 |
| | C. NO LIABILITY, NO WARRANTIES | 13 |
| | D. INDEMNIFICATION | 13 |
| | E. CONFIDENTIAL INFORMATION | 13 |
| | F. EXCLUSIVE RELATIONSHIP/NON-COMPETITION AGREEMENT | 14 |
| 6. | FEES | 14 |
| | A. INITIAL FRANCHISE FEE | 14 |
| | B. MONTHLY ONGOING FEES | 14 |
| | C. ANNUAL DUES | 15 |
| | D. REGIONAL AND INTERNATIONAL ADVERTISING FUNDS | 16 |
| | E. SATELLITE OFFICE FEE | 16 |
| | F. PAYMENT/LATE CHARGES/INTEREST | 16 |
| | G. APPLICATION OF PAYMENTS | 17 |
| | H. SUSPENSION OF SERVICES | 17 |
| | I. SALES ASSOCIATE DEFINED | 17 |
| | J. REPORTING OF SALES ASSOCIATES | 17 |
| | K. SURVIVING FINANCIAL OBLIGATIONS | 17 |
| 7. | QUOTA | 18 |
| 8. | BUSINESS IMAGE AND OPERATING STANDARDS | 18 |
| | A. APPEARANCE OF OFFICE | 18 |
| | B. SYSTEM STANDARDS AND OPERATIONS MATERIALS | 18 |
| | C. COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES | 19 |
| | D. INSURANCE | 19 |
| | E. ORGANIZATION OF FRANCHISE OWNER | 21 |
| | F. MANAGEMENT OF THE OFFICE | 21 |
| | G. TRAINING | 21 |
| | H. PROFESSIONAL MEMBERSHIPS | 21 |
| | I. RE/MAX REFERRAL SYSTEM | 22 |
| | J. BROKER/OWNER COUNCIL | 22 |

## TABLE OF CONTENTS

**SECTION**                                                                                                    **PAGE**

K.    SUPPLIES AND PROMOTIONAL MATERIALS ................................................ 22
L.    MODIFICATIONS AND IMPROVEMENTS TO SYSTEM ............................. 22
M.   REAL ESTATE LISTINGS ON REMAX.COM ............................................... 22
N.    MAINTAINING INDEPENDENCE, AVOIDING CONFUSION AND
       ADVERTISING COMMISSIONS ........................................................ 23
O.    REPRESENTATION AND COVENANT CONCERNING TERRORISM ............ 23

9.    GUIDANCE AND ASSISTANCE ................................................................... 24
    A.    TRAINING ........................................................................................ 24
    B.    OPENING ASSISTANCE .................................................................... 24
    C.    ADVERTISING AND PROMOTION .................................................... 24
    D.    CONSULTATION AND EDUCATIONAL COURSES .............................. 24
    E.    SYSTEM RECOGNITION AND PROMOTION ..................................... 24
    F.    CONVENTIONS AND SEMINARS ..................................................... 25
    G.    CATALOGS AND PROFESSIONAL PUBLICATIONS ........................... 25

10.   RECORDS AND REPORTS .......................................................................... 25
    A.    ACCOUNTING AND RECORDS ......................................................... 25
    B.    REPORTS ......................................................................................... 25
    C.    OTHER INFORMATION .................................................................... 25

11.   INSPECTIONS AND AUDITS ...................................................................... 26
    A.    ACCESS TO RECORDS ..................................................................... 26
    B.    AUTHORIZATION FOR RELEASE OF RECORDS;
       AUTHORIZATION TO CONDUCT CREDIT REPORT AND BACKGROUND CHECK ........ 26
    C.    UNDERSTATEMENT OF AMOUNTS OWED/COST OF INSPECTION OR AUDIT ........... 26

12.   TRANSFER AND ASSIGNMENT PROVISIONS ............................................ 27
    A.    TRANSFER BY RE/MAX REGIONAL ................................................ 27
    B.    NO TRANSFER OR ASSIGNMENT BY YOU OR YOUR
       OWNERS WITHOUT APPROVAL ...................................................... 27
    C.    CONDITIONS FOR TRANSFER OR ASSIGNMENT OF LESS
       THAN CONTROLLING INTEREST ................................................... 27
    D.    CONDITIONS FOR TRANSFER OR ASSIGNMENT OF AGREEMENT
       OR CONTROLLING INTEREST IN FRANCHISE OWNER ................... 27
    E.    DEATH OR DISABILITY ................................................................... 29
    F.    TRANSFER TO A BUSINESS ENTITY ............................................... 29
    G.    EFFECT OF APPROVAL OF TRANSFER OR ASSIGNMENT ............... 29
    H.    RIGHT OF FIRST REFUSAL ............................................................. 29

13.   TERMINATION OF THE FRANCHISE ......................................................... 30
    A.    TERMINATION BY RE/MAX REGIONAL WITH CAUSE ................... 30
    B.    IMMEDIATE TERMINATION ............................................................ 30
    C.    TEN (10) DAYS NOTICE .................................................................. 32
    D.    THIRTY (30) DAYS NOTICE ............................................................ 32

14.   RIGHTS AND OBLIGATIONS OF RE/MAX REGIONAL AND FRANCHISE OWNER
    UPON TERMINATION OR EXPIRATION OF THE FRANCHISE ................... 32
    A.    PAYMENT OF AMOUNTS OWED TO RE/MAX
       REGIONAL AND INTERNATIONAL .................................................. 32
    B.    DE-IDENTIFICATION ...................................................................... 32
    C.    PREMISES ....................................................................................... 33
    D.    CONFIDENTIAL INFORMATION ...................................................... 34
    E.    CONTINUING OBLIGATIONS ........................................................... 34

## TABLE OF CONTENTS

| SECTION | | | PAGE |
|---|---|---|---|
| | F. | MONETARY OBLIGATIONS NOT RELEASED | 34 |
| | G. | TERMINATION NOT EXCLUSIVE REMEDY | 34 |
| | H. | RIGHT TO MEET WITH SALES ASSOCIATES | 34 |
| | I. | DAMAGES | 34 |
| 15. | DISPUTE RESOLUTION | | 34 |
| | A. | DISPUTE RESOLUTION | 34 |
| | B. | DISPUTES BETWEEN RE/MAX REGIONAL AND FRANCHISE OWNER | 34 |
| | C. | DISPUTES INVOLVING RE/MAX FRANCHISEES, SALES ASSOCIATES OR OTHER RE/MAX AFFILIATES | 35 |
| | D. | ALTERNATIVES | 35 |
| | E. | LOCALE | 35 |
| | F. | PROCEDURE | 35 |
| | G. | EXCEPTIONS TO MEDIATION AND ARBITRATION | 35 |
| 16. | CONSTRUCTION OF AGREEMENT AND ENFORCEMENT | | 36 |
| | A. | INVALID PROVISIONS; SUBSTITUTION OF VALID PROVISIONS | 36 |
| | B. | UNILATERAL WAIVER OF OBLIGATIONS | 36 |
| | C. | CONSENTS | 36 |
| | D. | NO GUARANTEES | 36 |
| | E. | NO WAIVER | 36 |
| | F. | CUMULATIVE REMEDIES | 36 |
| | G. | SPECIFIC PERFORMANCE; INJUNCTIVE RELIEF | 37 |
| | H. | COSTS AND LEGAL FEES | 37 |
| | I. | WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL | 37 |
| | J. | GOVERNING LAW/CONSENT TO JURISDICTION | 37 |
| | K. | BINDING EFFECT | 37 |
| | L. | MODIFICATION OF FRANCHISE AGREEMENT | 37 |
| | M. | NO LIABILITY TO OTHERS; NO OTHER BENEFICIARIES | 38 |
| | N. | CONSTRUCTION | 38 |
| | O. | JOINT AND SEVERAL LIABILITY | 38 |
| | P. | MULTIPLE ORIGINALS | 38 |
| | Q. | TIMING IS IMPORTANT | 38 |
| | R. | INDEPENDENT PROVISIONS | 38 |
| | S. | FRANCHISE OWNER MAY NOT WITHHOLD PAYMENT | 38 |
| | T. | RELEASE OF PRIOR CLAIMS | 38 |
| | U. | ACTIONS BARRED | 38 |
| | V. | AUTHORIZATION TO COMMUNICATE ELECTRONICALLY/ PROMPT RESPONSE REQUIRED | 39 |
| | W. | NOTICES AND PAYMENTS | 39 |
| | X. | CANCELLATION OF PRIOR UNDERSTANDINGS/ENTIRE AGREEMENT | 39 |
| | Y. | FORCE MAJEURE | 39 |
| | Z. | DELEGATION OF RE/MAX REGIONAL'S DUTIES UNDER THIS AGREEMENT | 40 |
| | AA. | PARAGRAPH HEADINGS | 40 |
| 17. | ACKNOWLEDGMENTS | | 40 |
| 18. | SUBMISSION OF AGREEMENT | | 41 |

EXHIBIT A – OWNERSHIP INFORMATION

EXHIBIT B – ESSENTIAL ICA PROVISIONS

GUARANTY AND ASSUMPTION OF OBLIGATIONS

## RE/MAX FLORIDA REGION
## FRANCHISE AGREEMENT

This Franchise Agreement (this "*Agreement*") is being entered as of January 1, 2008 (the "*Agreement Date*"). The parties to this Agreement are you, 847 Realty Services, Inc. as Franchise Owner, us, RE/MAX Florida Region, a Colorado limited liability company and regional subfranchisor of RE/MAX International, Inc., and, if you are a partnership, corporation or limited liability company, your "Owners" (defined below). This Agreement is for a RE/MAX® real estate services office to be located at: 847 North Collier Boulevard, Marco Island, FL 34145 (the "Premises") and operated under the trade name RE/MAX Results Realty.

1.   **INTRODUCTION.**

This Agreement has been written in an informal style in order to make it more easily readable and to be sure that you become thoroughly familiar with all of the important rights and obligations this Agreement covers before you sign it. In this Agreement, we refer to RE/MAX Florida Region, as "*we*," "*us*" or "*RE/MAX Regional*" and RE/MAX International, Inc., as "*International.*" We refer to each franchise who signs this Agreement as "*you*," "*Franchise Owner*" or "*Franchisee*." If you are presently a corporation, partnership, limited liability company or other business entity (collectively "*Business Entity*"), or if you, as an individual or individuals, make a subsequent assignment or transfer of this Agreement to a Business Entity under Section 12 of this Agreement, you will notice certain provisions that are applicable to the shareholder(s), partner(s) or member(s). We have relied on the qualifications, business skill, financial capability and personal character of these individuals in entering into this Agreement or in permitting such assignment or transfer. This individual or these individuals will be referred to in this Agreement as "*Owners.*"

Through the expenditure of considerable time, effort and money, International has devised and promoted for the benefit of RE/MAX Regional and other RE/MAX subfranchisors and franchisees (collectively "*RE/MAX Affiliates*") a system (the "*System*" or "*RE/MAX System*") for the establishment and operation of offices ("*RE/MAX office or offices*") offering high quality real estate services under the name "RE/MAX®" and certain other service marks, trademarks, trade dress and other commercial symbols, including "Above the Crowd," the RE/MAX Balloon and Design, the red-over-white-over-blue horizontal bar design and such other service marks, trademarks, trade dress and symbols as International may develop from time-to-time (the "*RE/MAX Marks*"). The distinguishing characteristics of the System include, but are not limited to:

   (1)   Common use and promotion of the RE/MAX Marks;

   (2)   Distinctive sales and promotional materials;

   (3)   Standardized supplies and other materials used in RE/MAX offices;

   (4)   Centralized advertising, promotional and referral services;

   (5)   Recommended procedures for operation of RE/MAX offices providing efficient, high quality and courteous services to the public;

   (6)   A standardized uniform system for the operation of a real estate service office in accordance with ethical standards and policies; and

   (7)   A high commission concept.

RE/MAX Regional owns the right to franchise the operation of RE/MAX offices under the RE/MAX Marks and the System in this region.

This Agreement is being presented to you because of the desire you have expressed to obtain the right to own and be franchised to operate a RE/MAX office. In signing this Agreement, you acknowledge your understanding of the importance of our high standards of quality and service and the necessity of operating your RE/MAX office in conformity with our standards and specifications. You represent to us, as an inducement to our entering into this Agreement with you, that there have been no misrepresentations to us, or material omissions, in your application for the rights granted by this Agreement or in the financial information provided by you and your Owners. You further represent that you have dealt in many varied business transactions in the past which have been of greater complexity than this transaction, and that you are not purchasing a RE/MAX franchise for speculative purposes.

2.      **GRANT AND RENEWAL OF FRANCHISE.**

     A.      **GRANT AND TERM OF FRANCHISE.**

          (1)      **Grant.**

Subject to the provisions of this Agreement, we grant to you a franchise (the *"Franchise"*), and you undertake the obligation, to establish and own a single RE/MAX real estate office (the *"Office"*) using the distinguishing characteristics of the System to be operated only at the location and only under the trade name identified on the first page of this Agreement, both of which must be approved in advance by RE/MAX Regional. You acknowledge and represent that you have contacted the appropriate state regulatory agencies to confirm that the self-standing portion of the trade name is available. You acknowledge and agree that neither our approval, nor the approval of a state regulatory agency, of the self-standing portion of the trade name (—that portion of the trade name that does not include the RE/MAX mark) does not constitute an assurance, representation or warranty of any kind, express or implied, that a prior user of the self-standing portion of the trade name does not exist or that a prior user will not assert rights in that name. If the location of the Premises has not been selected and approved as of the Agreement Date, and the parties cannot agree on a mutually acceptable location within 90 days of the Agreement Date, it will be deemed to be a failure of a material condition precedent, entitling us to terminate this Agreement. You acknowledge and agree that our approval of the location of the Premises does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the location for the Office or as to the profitability of a RE/MAX office operated at that location. You further acknowledge and agree that you have independently investigated the suitability of the location of the Office, and that RE/MAX Regional will not be responsible if the Office fails to meet your expectations as to revenue. You may only operate the Office for the purpose of providing permitted real estate service activities as defined below; the Office may not be used to conduct another business or to generate revenue from any other activities, except with our prior written consent, which may be withheld in our sole and absolute discretion.

          (2)      **Permitted Real Estate Services.**

*"Permitted Real Estate Service Activities"*, for purposes of this Agreement, means activities directly related to the business of listing, offering, selling, exchanging and managing real property and the providing of marketing or consulting services or other activities with respect to auctioning, leasing or renting of real property or representing sellers, purchasers, lessors or renters of real property. Permitted Real Estate Service Activities expressly excludes all non-real estate related activity as well as the offering or performing of ancillary real estate services or activities, including without limitation, title insurance or searches, mortgage brokerage and mortgage origination, insurance or insurance related services or products, escrow or appraisal services and home inspection services. Subject to the restrictions set forth in Subsection 5.F., you are not prohibited from performing these or other non-real estate related or ancillary services, or from engaging in businesses that offer such services, but you may not use the distinguishing characteristics of the System in any manner in connection with such non-real estate related or ancillary services or businesses or in connection with any other services or businesses that are not Permitted Real Estate Service Activities without our prior written consent and you must properly segregate the operations of any such services or businesses from the operation of the Office as we deem appropriate.

(3)    Term.

The term of the Franchise will begin on the Agreement Date and continue for a period of five years (the "*Term*"), unless the Franchise is terminated earlier pursuant to the provisions of this Agreement. Termination or expiration of this Agreement will constitute termination or expiration of your Franchise and the Limited License to use the RE/MAX Marks conferred by Section 4 of this Agreement.

B.    **FULL TERM PERFORMANCE.**

You specifically agree to operate the Office in accordance with the provisions of this Agreement, perform the obligations of this Agreement, and continuously exert your best efforts to promote and enhance the business of the Office for the Term.

C.    **LOCATION OF OFFICE.**

The Franchise granted by this Agreement gives you the right to operate a single RE/MAX real estate office only at the Premises. Except as otherwise permitted by this Agreement, you agree that you will not operate or establish, or permit your Sales Associates (as defined in Subsection 6.1. below) to operate or establish, any satellite office, branch office or other extension of the Office from any other location without our prior written consent. You further agree not to conduct, or permit anyone affiliated with the Office to conduct, any business or activity at the Premises other than the real estate service business authorized by this Agreement. You expressly acknowledge and agree that absolutely no territorial rights or protections are afforded to you under this Agreement. You further expressly acknowledge and agree that, under the terms of this Agreement, we and/or International may operate, or grant a franchise or license to operate, at any location whatsoever, including a location in close proximity to your Office, a RE/MAX office or other real estate brokerage office using any other trademark or service mark, even if such office has an adverse impact on your business. You expressly waive any claims you may have that we and/or International violated this Agreement, the implied covenant of good faith and fair dealing, or a law, statute, or regulation as a result of the location of your Office or of other RE/MAX (or other real estate brokerage) offices.

Although you are only granted the right to establish a single RE/MAX real estate office to be operated only at the Premises, neither you nor any other RE/MAX office is limited to listing, selling, or otherwise dealing with property or representing clients or customers within any defined geographic area except as otherwise provided by applicable licensing laws and regulations. However, as a RE/MAX affiliate and a user of the RE/MAX Marks under the Limited License set out in Section 4, you are expected to meet high standards of real estate service and professionalism reflective of the goodwill and respect enjoyed by the RE/MAX name and organization. These expectations may only be met by limiting your real estate services to market areas where you can serve customers and clients directly and personally and where you have the greatest knowledge of local conditions, infrastructures, community history and the housing market. Accordingly, you agree to refer all requests for real estate services in areas in which you are unable to meet such requirements or elect not to provide service, to the RE/MAX office for that area, or if there is no RE/MAX office in that area, then to International's Referral Department as provided in Subsection 8.1. of this Agreement.

D.    **RESERVATION OF RIGHTS.**

Nothing contained in this Agreement shall be deemed, expressly or by implication, to restrict in any way the right of RE/MAX Regional or International or any of our or International's affiliates, now or in the future, from engaging in any business activities whatsoever, without limitation as to location or channels of distribution; and from using the RE/MAX Marks and other proprietary rights in our or International's other business activities without limitation; and from selling any products or services under the RE/MAX Marks, or under any other trademarks, service marks or trade dress, through other channels of distribution. You acknowledge that RE/MAX Regional and International retain all rights to establish or acquire, or authorize others to establish or acquire, additional real estate brokerage office locations without regard to proximity to the Premises and that such market development is an integral part of the marketing concept underlying RE/MAX Regional's and International's business. Nothing contained in this Agreement shall be deemed, expressly or by implication, to grant to you any type of exclusive or protected territory or any right to limit, control, or prevent RE/MAX Regional's or International's right to own, operate, franchise, or license or in any other manner authorize the location and operation of real estate brokerage businesses at any location whatsoever. Moreover, nothing

contained in this Agreement shall be deemed, expressly or by implication, to grant or extend to you a right of first refusal, option or any other right to purchase, acquire or open an additional RE/MAX franchise now or in the future.

Neither RE/MAX Regional nor International shall be liable to you for any damages or loss of sales or profits (if any), based on actual or anticipated adverse consequences to you which may result from their continuing activities in the development of the System or other exercise of the rights reserved to them under this Agreement.

The term "*affiliate*" as used in this Subsection 2.D. shall mean any entity that directly or indirectly, in whole or in part, is controlled by or under common control with us, International or any of our or International's officers, directors or shareholders.

E.   **RENEWAL OF FRANCHISE.**

You may, at your option, renew your franchise relationship for an additional period if you meet the following conditions:

(1)   You have complied with all of the terms and conditions of this Agreement throughout the Term;

(2)   You have exercised diligent efforts to develop your Office to its full potential during the Term, in a manner acceptable to us;

(3)   You and your Owners execute a form authorizing RE/MAX Regional to obtain a consumer report and to conduct a credit and background check;

(4)   You meet our then current subjective and objective standards for new franchisees, including those relating to relevant experience, education and licensing, background and past record of compliance with laws, financial capacity, skills, integrity and other qualities of character;

(5)   You pay us a renewal fee equal to $8,500.00;

(6)   You have given us written notice of your election to renew your franchise relationship not less than six months nor more than 12 months prior to the end of the Term;

(7)   You or your Owner responsible for the Office shall complete, at your expense, the RE/MAX 501 Advanced Profitability Course, or other training required by us (or provide us with evidence that you or such Owner has satisfied requirements equivalent to such course or training); and

(8)   *You and your Owners agree to execute the form of franchise agreement (including the appropriate renewal addendum)* we are then customarily using in the grant of franchises for RE/MAX offices, which agreement and renewal addendum shall supersede this Agreement and may have terms materially different than this Agreement, including without limitation, requirements to upgrade equipment and facilities, use new systems and procedures, pay higher fees, dues and advertising contributions and meet higher quotas.

You must notify us in writing not less than 6 months nor more than 12 months prior to the end of the Term whether or not you intend to renew your franchise relationship with us. If you fail to provide us with notice of your intentions regarding renewal within such time period, we will deem your failure to notify us as your decision not to renew. In such case, you understand and agree that the Franchise shall expire at the end of the Term.

Renewal of your franchise relationship will be conditioned on your and your Owners' continued compliance with all of the terms and conditions of this Agreement up to the date of expiration.

Renewal of your franchise relationship shall be for a five-year period.

RE/MAX Florida/FA
July 2007

If you continue to operate the Office as a RE/MAX office after the end of the Term without proper renewal, you will be deemed to be operating on a month-to-month basis under the terms and conditions of the franchise and other agreements then being used by us for the grant of franchises for a RE/MAX office within the state in which the Office is located, provided that RE/MAX Regional reserves the unfettered right to terminate at any time, and without cause, your right to operate the Office under these circumstances, upon 10 days prior written notice to you.

F.   **SATELLITE OFFICES.**

We may grant you the right to establish one or more additional office locations ("*Satellite Offices*") in order to accommodate Sales Associates (as defined in Subsection 6.I. of this Agreement) who have a team of individuals assisting them and who need additional office space, provided that you shall not then, or at any time thereafter prior to the opening of such Satellite Office, be in default of any of your obligations arising under this Agreement and subject to the additional conditions set forth below.

RE/MAX Regional reserves the unfettered right to grant permission to establish a Satellite Office. Factors we will consider in determining whether to grant you the right to establish a Satellite Office include, without limitation, the location of the proposed Satellite Office, population growth and the overall market share enjoyed by RE/MAX in the area of the proposed Satellite Office and other market conditions that may affect the desirability of establishing a Satellite Office.

You must execute the then current form of Satellite Office Amendment and pay a Satellite Office fee as set forth in Subsection 6.E. for each Satellite Office you open. Each Satellite Office must be located within one-mile driving distance of the Office at a site approved by us and must not be within one-mile driving distance of any other RE/MAX office. We may, in our sole and absolute discretion, permit you to open a Satellite Office outside one-mile driving distance of the Office as long as it is not within the protected area or exclusive territory of any other RE/MAX office. Each Satellite Office shall operate as a part of the Office (i.e., as a branch of the Office operating under and as a part of the same ownership as the Office), shall operate under the same name as the Office and, except as otherwise provided in this Agreement, shall comply with and be subject in every respect to all of the terms, conditions, provisions and restrictions of this Agreement as are applicable to the Office. You understand and acknowledge that neither we nor International is under any obligation to provide Satellite Offices any of the services and benefits made available to the Office although we and International may provide some services and benefits to Satellite Offices as we and International, in our sole and absolute discretion, deem appropriate.

Satellite Offices shall be "address only" locations and therefore shall have no protected area or territorial exclusivity whatsoever. Each Satellite Office must have at least 600 square feet but not more than 1,200 square feet of office space.

3.   **OPENING AND EQUIPPING OF OFFICE.**

You agree to cause the Office to be "opened" and operating within a period of 180 calendar days from the Agreement Date. "*Opened*" means having an office with a minimum of 1,200 square feet, staffed by a full-time secretary, and equipped with furniture, a computer system, a phone system, a fax, a printer and other office equipment necessary to operate a RE/MAX office in conformity with our high standards of quality and service. You acknowledge and agree that you are responsible for assuring that the Office is constructed in compliance with all applicable laws, including without limitation, the Americans with Disabilities Act. You further agree that you will operate the office continuously during the Term, and that you will not abandon, surrender, transfer control of or lose the right to occupy the Premises, or fail to occupy the Office, for a period in excess of five (5) consecutive days, unless caused by fire, flood, earthquake or other cause beyond your control, as more fully set forth in Subsection 16.Y.

To facilitate your reporting to us and International and to meet other communication requirements, you agree to implement all systems, programs and procedures we or International establish from time-to-time. Such systems, programs or procedures may include, but are not limited to, communication systems, accounting programs, data management systems and other systems designed to facilitate the flow of information relating to the System or the business contemplated by this Agreement. Throughout the Term, you must maintain a computer system that has capabilities compatible with all communications and data reporting requirements of International and you must have electronic mail capability and Internet access and participate in any Intranet or Extranet developed by us or International.

Therefore, you must have computer hardware that meets certain minimum standards established by us or International and use certain software as we or International specify from time-to-time. You must also upgrade or update such hardware and software throughout the Term as we or International specify. You are responsible for the cost of implementing such systems, programs or procedures, including the cost of purchasing or leasing computer hardware and software required by us or International.

You must subscribe to the RE/MAX Satellite Network ("*RSN*") which requires that you have a satellite dish and related equipment of the type and kind specified by International in order to receive training and educational programming to be broadcast by RSN. You will be required to sign and abide by a satellite network service agreement which sets forth the costs of RSN and other terms and conditions relating to RSN. International currently does not charge a programming fee, although it may choose to do so in the future; if International does charge a programming fee in the future, you will be required to pay it. International has arranged with its current service provider to supply the Equipment and basic installation to you at no cost, although you will be required to pay the RSN service provider from $35 to $70 per month as a service and maintenance fee. This fee will vary depending on the type of Equipment in your office. The exact service and maintenance fee you will be required to pay will be posted on RE/MAX Mainstreet. When International's agreement with the current supplier expires, you may be required to purchase different Equipment either from the same service provider or a different provider designated by International.

You must also subscribe, and ensure that each Sales Associate (as defined in Subsection 6.I.) subscribes, to RE/MAX Mainstreet, a password protected Extranet site which serves as an electronic communication web site for the exchange of important RE/MAX information. You, and each Sales Associate affiliated with your office, will also be required to sign and abide by a RE/MAX Mainstreet Member Registration and Website User Agreement, which sets forth the terms and conditions relating to the use of RE/MAX Mainstreet. Neither you nor any Sales Associate affiliated with your Office may use RE/MAX Mainstreet to send unsolicited bulk electronic messages. You agree not to block or blacklist any remax.net message.

You will be required to implement any other specific systems, programs or procedures as we or International may establish from time-to-time to enhance our communications with you. You agree that RE/MAX Regional or International may require that certain goods, services, supplies, fixtures, equipment, inventory, and computer hardware and software relating to the Office's establishment or operation be purchased from us or from other suppliers as we may designate.

4.    **LIMITED LICENSE TO USE RE/MAX MARKS.**

    A.    **OWNERSHIP AND GOODWILL AND LIMITED LICENSE.**

Subject to all of the terms and conditions set forth herein, you are hereby granted a limited, non-exclusive license ("*Limited License*") to use the RE/MAX Marks, but only for the duration of this Agreement and only in connection with the operation of the Office and the Permitted Real Estate Service Activities specified in this Agreement (the "*Licensed Use*"). Your Limited License does not give you the right to sublicense or to transfer (apart from an approved transfer under Section 12) the RE/MAX Marks or to allow any third party to use your Office trade, fictitious or assumed name for any purpose whatsoever. You agree that if this Agreement is terminated, expires, is transferred without our consent or approval, or is for any reason declared void or of no force or effect, this Limited License shall automatically terminate. You further agree that in the event of such a termination of this Limited License you will immediately cease all use of the RE/MAX Marks and promptly comply with all post-termination requirements of Section 14 of this Agreement.

    (1)    "RE/MAX" Required in d/b/a but Prohibited in Entity Name.

You are required to use the term "RE/MAX" as the first word in the trade identification of the Office, and you must obtain any trade, fictitious or assumed name registrations as may be required under applicable law for, and to operate the Office only under, such trade, fictitious or assumed name. You agree not to use the term "RE/MAX" or any of the other RE/MAX Marks (or any variations or renditions similar to any of the RE/MAX Marks) in, or as part of, your formal corporate or legal name.

(2)    Ownership of RE/MAX Marks and Goodwill.

You acknowledge and agree that: i) International is the exclusive owner of the RE/MAX Marks and that such marks are invaluable assets of International; ii) your license to use the RE/MAX Marks is derived solely from this Agreement and is limited to the Licensed Use that is otherwise in compliance with this Agreement; iii) all use of the RE/MAX Marks, and any goodwill established by such use, including, without limitation, the use of the trade, assumed or fictitious name you adopt for your Office that includes the term "RE/MAX," will inure exclusively to the benefit of International, and that the same will automatically vest in and remain the exclusive property of International. You further acknowledge and agree that under this Agreement you shall not acquire any right, ownership or other interests in or to: i) the RE/MAX Marks, other than the Limited License granted herein, or ii) the goodwill associated with the RE/MAX Marks.

(3)    High Standards of Service and Professionalism Required.

You acknowledge and agree that the RE/MAX Marks embody and represent the goodwill of the RE/MAX organization, and identify the RE/MAX network as the source of the highest standards of quality real estate services and agent professionalism. You agree to assure that the Permitted Real Estate Service Activities provided by you, and by all Sales Associates affiliated with your Office, adhere to such high standards in regards to all Permitted Real Estate Service Activities offered or provided under the RE/MAX Marks and in the name of your Office. In this regard, you also agree to assure that all uses of the RE/MAX Marks are strictly in accordance with all applicable standards, operating procedures, policies and guidelines that we or International prescribe—and from time-to-time amend—during the duration of this Agreement, including, without limitation, the rules, standards and guidelines of use, as amended from time-to-time and set forth in the most current edition of the Trademark and Graphic Standards Manual (the "*Trademark Manual*") and other publications, if any, dedicated to proper use of the RE/MAX Marks. Finally, you agree to comply with, and assure that all of your Sales Associates comply with, the business image and operating standards set forth in Section 8 of this Agreement. You understand and acknowledge that such business image and operating standards have been established to protect the goodwill of the RE/MAX organization, as embodied by the RE/MAX Marks, but do not, and are not intended to, govern the day-to-day operations of your Office.

(4)    Sales Associates Not Licensed to Use RE/MAX Marks.

You acknowledge and agree that no one employed by your Office in any capacity or affiliated with your Office as a Sales Associate has any direct or independent right or license to use the RE/MAX Marks, but rather that their use of the RE/MAX Marks comes under and is subject to your Limited License to use such marks as set forth in this Agreement. You agree to be responsible for ensuring that you and everyone employed by or affiliated with your Office who uses the RE/MAX Marks under this Limited License, does so only in the name of your Office, in furtherance of the Permitted Real Estate Service Activities provided out of your Office and in a manner that is consistent with all applicable limitations, including without limitation, those set forth below.

(5)    Extension of Limited License to Other/Future Marks.

All provisions of this Agreement applicable to the RE/MAX Marks will apply to any additional trademarks, service marks, commercial symbols, designs, art work and logos that International may in the future authorize you to use.

B.    **SPECIFIC LIMITATIONS ON LICENSE TO USE RE/MAX MARKS.**

Your Limited License to use the RE/MAX Marks is subject to various limitations that are designed to protect the marks themselves, the goodwill they reflect and the reputation of the RE/MAX network. In addition to those set forth in the Trademark Manual, your use of the RE/MAX Marks must conform to the following requirements and limitations.

(1)    Use Office Address.

You agree to use your office address in all advertising of your services and to assure that your Sales

Associates also use such office address and meet all other requirements of the Trademark Manual in their advertising and personal promotion efforts. More specifically, you agree not to use, and not to permit your Sales Associates to use, the RE/MAX Marks in any manner that may mislead or deceive consumers regarding your Office location, the scope of the geographic area your Office serves or your relationship to us or International.

(2)    No Service Area Misrepresentations or Competing Services.

While you are not limited in the reach of your advertising to attract consumers to your Office for Permitted Real Estate Service Activities involving the properties in the local market areas your Office serves, you are not permitted to use the RE/MAX Marks in connection with competing or other businesses as described below or to hold yourself out: i) as having the capacity to serve the real estate needs of consumers in distant market areas where neither you nor any of your Sales Associates can personally and directly provide quality, competent services, such as on a state-wide, multi-state, national or international scale; or ii) as a state-wide, multi-state, national or international provider of agent or office locator services or information; or iii) as an operator, developer, owner, promoter or provider of consumer-to-agent or agent-to-agent referral services. The foregoing limitations shall not be interpreted or asserted to limit or inhibit in any way your ability to refer current or past clients and customers from within the market areas you or your Office serve, or friends and family members, to other RE/MAX affiliates, irrespective of where those other RE/MAX affiliates or their offices may be located and to condition such referrals on the payment of a referral fee.

a.    Local Markets Served Personally and Directly.

Consistent with the foregoing, you agree to insure that neither you nor your Office nor any of your Sales Associates engage in any advertising, or permit use of your Office name in directories or in any other manner, that offers, or infers the availability by or through your Office of, real estate services in a geographic area or market that is not served personally and directly by you or one of your Sales Associates or where your Office lacks the local market knowledge and familiarity necessary to provide informed, competent, high quality real estate services or that is too distant from your Office for you or any Sales Associate affiliated with your Office to personally and directly serve and satisfy the real estate service needs of buyers, sellers or renters.

b.    No Office/Agent Locator Services or Private Referral Networks.

Your Limited License does not authorize you to use, and you agree not to use, or to permit any Sales Associate to use, the RE/MAX Marks in connection with the offering, providing, performance, sale, endorsement or promotion of any other services, products or businesses or in any other manner we have not expressly authorized in writing. Consistent with your Limited License, neither you nor any of your Sales Associates are permitted to engage in the offering of or participate in the offering of RE/MAX Office/Agent Locator Services or Private Referral Network Services or any other prohibited service or activity described in the Trademark Manual as from time-to-time amended. In addition, you agree not to engage in any other business or activity that does not conform to the high standards of the RE/MAX organization or that competes with or undermines free services offered consumers or the RE/MAX network by RE/MAX Regional or International.

(3)    Style of Use, Relative Prominence in d/b/a.

You agree to use and display the RE/MAX Marks in the style and graphic manner illustrated in the Trademark Manual, and to use, along with the RE/MAX Marks, notices of federal trademark and service mark registrations in the manner specified in the Trademark Manual.  You further agree not to use any RE/MAX Mark with any prefix, suffix, or other modifying words, terms, designs, or symbols, or in any other modified form.  In regards to the name of your Office, you agree to use substantially the same font height, weight and color for the term "RE/MAX" as you use for the balance of your trade, assumed or fictitious name.  You are not permitted in business listings, directories or in referral services where your Office name may be displayed, to exaggerate, enlarge, color or stylize the "RE/MAX" portion of your Office name so as to obscure, dominate or weaken the balance of that name or to otherwise create a presentation that may mislead or deceive consumers to believe they are not dealing with a local real estate service business.

(4)    No Use of RE/MAX Marks by Vendors, Directories, Referral Services, Other Licenses.

You are not permitted to allow any vendor, service provider or other third party to stylize or otherwise engage in any uses of your Office name of the type described above or in any other manner that may suggest they are sponsored or endorsed by, or affiliated with, the RE/MAX network. In this regard, you acknowledge and agree that your Limited License to use the RE/MAX Marks does not permit you to allow: (i) any vendor or other third parties to use any of the RE/MAX Marks or your Office name in connection with any vendor's or third party's product or service or in any movie or video or theatrical or musical production or the like, or (ii) any telephone directory or other directory to show the "RE/MAX" portion of your Office name in an emphasized, exaggerated, enlarged or stylized or any other format that does not give equal prominence to the balance of your trade, fictitious or assumed Office name. Lastly, you will not authorize or permit real estate licensees who are not registered or licensed as Sales Associates with your Office to appear with or be listed under your name, your Office name, the name of any Sales Associate or of any "Team" known to be associated with your Office or under any of the RE/MAX Marks or to otherwise use or benefit from the use of any of the RE/MAX Marks.

(5)    Ownership and Control Over Use of Office Phone Numbers.

You agree that all telephone numbers you use for the Office shall be used solely in connection with the Permitted Real Estate Service Activities authorized by this Agreement to be provided out of your Office. You acknowledge that some or all of the telephone numbers will appear under the name RE/MAX, in conjunction with the self-standing name of your Office (the d/b/a of your Office), in directory listings, in yellow pages display advertising and in other forms of advertising. Neither you nor any of your Sales Associates may publish any telephone advertisement or secure or list any telephone number that could confuse other real estate professionals, the industry or the public about the ownership, operation, location of, or geographic areas or markets served by, your Office or any other RE/MAX office.

(6)    Post-Termination Assignment and Redirection of Calls, Authority to Direct Phone Company.

Upon termination or expiration of this Agreement, you agree to promptly assign all of the telephone numbers listed for the Office to us or to our designee, with no forwarding message or other information that would steer callers from us or our designee, and to instruct the telephone company in writing to redirect all calls thereafter going to such numbers to RE/MAX Regional or otherwise in accordance with our directions. You agree that any telephone company and all directory listing agencies may accept your signature on this Agreement as conclusive evidence of the rights of RE/MAX Regional to ownership, control and benefit of such telephone numbers as an integral and distinguishing characteristic of the RE/MAX System and goodwill. You hereby direct each such telephone company or directory listing agency to accept your signature on this Agreement as your signed authorization and direction to them to assign, and re-direct calls to such phone numbers to us or our designee as described above, and to discontinue or modify at next printing of the yellow pages, all listings and display ads that reference the Office and include such phone numbers, as directed by us or International.

(7)    Creation, Ownership and Responsibility for RE/MAX Formative Domain Names.

This Agreement does not obligate you to secure or allow your Sales Associates to have or to secure Internet domain names that include the term "remax" ("*RE/MAX Formative Domain Names*"). If you decide to register one or more RE/MAX Formative Domain Names for your Office, you agree first to assure that each such RE/MAX Formative Domain Name complies strictly with the domain name guidelines set forth in the Trademark Manual and in any other guidelines International issues on RE/MAX Formative Domain Names. If you register RE/MAX Formative Domain Names on behalf of your Sales Associates or if you allow your Sales Associates to themselves register and own RE/MAX Formative Domain Names, you agree first to assure that each such RE/MAX Formative Domain Name complies *strictly* with the guidelines prescribed by International through the Trademark Manual and through any other guidelines it issues on RE/MAX Formative Domain Names.

a.    Franchisee Must Own or Control RE/MAX Formative Domain Names.

You acknowledge and understand that because all uses of the RE/MAX Marks by your Sales Associates and by you are based upon your Limited License under this Agreement, you become and remain responsible for assuring that every RE/MAX Formative Domain Name created by you and/or your Sales Associates remains or becomes your property in the case of such domain names for Sales Associates who cease for any reason to be affiliates of the RE/MAX network, and the property of RE/MAX Regional, in the event of termination or expiration without renewal of your franchise relationship with us. To this end, you agree to include in your written independent contractor agreement with each Sales Associate a provision that requires them to assign every RE/MAX Formative Domain Name they own, or control or have registered, to you in the event their affiliation with the RE/MAX network ceases for any reason.

b.    RE/MAX Formative Domain Names for Office Business Only.

You also agree that all web sites to which RE/MAX Formative Domain Names resolve and/or point shall be used solely for the promotion of the Permitted Real Estate Service Activities conducted out of your Office under this Agreement and for any personal promotion advertising you permit your Sales Associates to place under the name of your Office and that is otherwise in strict compliance with the Trademark Manual.

c.    Post-Termination Assignment and Redirection of Traffic, Authority to Direct Registrars.

In the event of termination or expiration without renewal of your franchise relationship with us, you agree to promptly assign all of the RE/MAX Formative Domain Names you register, and all those that your Sales Associates have registered, to us or our designee or, if we so direct, to deactivate some or all of such RE/MAX Formative Domain Names or to re-direct all traffic coming to some or all of those domain names to a web site designated by us or International. You agree to direct all Internet service providers, domain name registrars and domain name listing agencies to accept this Agreement as conclusive of the rights of RE/MAX Regional to ownership, control and benefit of all RE/MAX Formative Domain Names you or your Sales Associates create. Consistent with and to permit you to satisfy your obligations regarding the foregoing and other post-termination de-identification obligations you have under this Agreement, you agree to maintain ownership of and control over all RE/MAX Formative Domain Names you create or authorize under your Limited License.

d.    Franchisee Bears Costs to Recover/Escrow Non-compliant RE/MAX Formative Domain Names.

Upon request from us or International, you agree, at your expense, to take any and all action necessary to deactivate, re-direct, escrow, transfer, terminate and/or disconnect any non-compliant or abandoned RE/MAX Formative Domain Name that was registered by you, the Office, any of your Sales Associates or anyone else currently or formerly employed by or affiliated with your Office, or that was registered by any entity that has been commissioned to register such domain name by you, the Office, your Sales Associates or anyone else currently or formerly employed by or affiliated with your Office.

You agree to pay directly, or reimburse us and International for, any and all costs and attorney fees we and International incur in the process of securing, deactivating and then escrowing for up to three years, any RE/MAX Formative Domain Name, or any domain name that contains any other rendition of the term "RE/MAX" or any of the other RE/MAX Marks, that was registered by you or your Office or by any of your Sales Associates (i) that does not comply with the form and guidelines specified by International or (ii) that is not owned by you and is not assigned upon termination or expiration of this Agreement to RE/MAX Regional or (iii) that is owned by any Sales Associate affiliated with you at any time and is not assigned to you upon the termination or non-renewal of the

independent contractor agreement of such Sales Associate or (iv) that is abandoned without renewal of its registration by you or any Sales Associate.

(8)   Identity of Office Required with Internet Uses of RE/MAX Marks.

You agree that all uses of the RE/MAX Marks at a given web site on the Internet, such as on an Office home page or virtual office web site, will be accompanied by your Office name, address, phone number and prominently indicate that "Each RE/MAX Office is Independently Owned and Operated." You further agree that such web sites will be devoted solely to the promotion of the Permitted Real Estate Service Activities provided by your Office, and will otherwise comply with this Agreement and the guidelines for use of the RE/MAX Marks set forth in the Trademark Manual. You agree to refrain from sharing or linking any web site in connection with which your Office name or the RE/MAX Marks are used with or to any web site of a competitor of the RE/MAX network or from promoting the name, image or business of any licensed real estate agent who is not a RE/MAX Affiliate.

(9)   Electronic Links to Regional or International Web Sites May Be Required.

If required by RE/MAX Regional or International, you shall establish your web site as part of our or International's website, and/or establish electronic links to our or International's web site. With the exception of the use of RE/MAX Formative Domain Names, as provided above, neither you, your Sales Associates nor anyone else employed by or affiliated with the Office shall use any of the RE/MAX Marks as part of any e-mail address or domain name or Internet URL address. International may require that various other types of marketing or advertising on the Internet involving the RE/MAX Marks or the name of your Office also utilize a specific template or format and if it does, you agree to follow that template or format.

(10)   Ownership and Use of Hot Air Balloons.

You acknowledge and agree that RE/MAX hot air balloons, which are intended to be used to maximize public awareness and recognition of the RE/MAX name and to promote and enhance public goodwill reflected in the RE/MAX Marks, must always remain under the control and ownership of RE/MAX Regional, International or a duly appointed designee of either. You understand that RE/MAX Regional or one of its designees will exercise reasonable efforts to make a RE/MAX hot air balloon available to you for a reasonable fee should you desire to use one for promotional purposes. You agree that neither you, your Owners nor your Sales Associates will purchase or own, for any purpose, a RE/MAX hot air balloon or any hot air balloon depicting a red-over-white-over-blue trade dress, or that otherwise depicts, or is confusingly similar to, any of the RE/MAX Marks.

(11)   Franchisee Supervision Required to Assure Compliance.

You agree to be responsible for, and to supervise, your Sales Associates in order to ensure the proper use of the RE/MAX Marks and their full compliance with the provisions of this Section 4 and the Trademark Manual as it may be amended from time-to-time. You acknowledge and agree that if you make, or anyone employed by or affiliated with your Office makes, any improper or unauthorized use of the RE/MAX Marks, it will constitute an infringement of International's exclusive rights in and to the RE/MAX Marks and a default of Section 4 of this Agreement. A default under the provisions of this Section 4 by you or anyone employed by or affiliated with your Office shall be deemed a material default of an essential condition of this Agreement that, in addition to other recourses available to RE/MAX Regional or International, will give rise to the termination provisions of Section 13.

(12)   International is "Third Party Beneficiary" under RE/MAX Marks Provisions.

You acknowledge and agree that International is a third party beneficiary of Section 4 of this Agreement and of every other Section or Subsection of this Agreement that deals with use of the RE/MAX Marks and/or the RE/MAX System.

---

C.  **NOTIFICATION OF INFRINGEMENTS AND CLAIMS.**

You agree to immediately notify us in writing of any apparent infringement of or challenge to any of International's copyrights or any of the RE/MAX Marks, or of any claim by any person of any rights in such copyrights, RE/MAX Marks or similar trade names, trademarks or service marks of which you become aware. You agree not to communicate with anyone except us, International and our respective counsel in connection with any such infringement, challenge or claim and agree that International will have the sole right to determine whether an infringement, challenge or claim exists, and if so, to exclusively control any litigation, any U.S. Patent and Trademark Office proceeding or any other proceeding arising out of any such infringement, challenge or claim. You agree to cooperate with and assist International with the initial and any follow up investigation of the alleged infringement of or challenge to International's copyrights or Marks. You agree to sign any documents, render any assistance, and do any acts that International, in its sole discretion, believes are necessary or advisable in order to protect, maintain or perfect International's interests in any litigation or proceeding related to such copyrights or the RE/MAX Marks or to otherwise protect, maintain or perfect International's interests in such copyrights or the RE/MAX Marks. You acknowledge and understand that International will have no obligation to defend the RE/MAX Marks from valid claims of prior use or of lawful concurrent use by others.

D.  **DISCONTINUANCE OF USE OF RE/MAX MARKS.**

If it becomes advisable at any time in International's sole judgment for the Office to modify or discontinue the use of any RE/MAX Mark or for the Office to use one or more additional or substitute trade or service marks, including the RE/MAX Mark used as part of the trade, fictitious or assumed name of the Office or in a Domain Name, you agree, at your expense, to comply with our directions to modify or otherwise discontinue the use of the RE/MAX Mark, or use one or more additional or substitute trade or service marks, within a reasonable time after our notice to you.

5.  **RELATIONSHIP OF THE PARTIES; INDEMNIFICATION.**

A.  **INDEPENDENT CONTRACTOR; NO FIDUCIARY RELATIONSHIP; INDEPENDENTLY OWNED AND OPERATED.**

Both of us understand and agree that this Agreement does not create a fiduciary relationship between us, that you are an independent contractor, and that nothing in this Agreement is intended to make either party a general or special agent, joint venturer, partner, or employee of the other for any purpose whatsoever. All employees or agents hired or engaged by or working for you shall be your employees or agents only, and shall not for any purpose be deemed employees or agents of ours or International nor subject to our or International's control. However, we have the right, and you must permit us, to communicate directly with your Sales Associates concerning any matter that we deem necessary or appropriate relating to the System or your Office, without incurring any liability to you. You agree to conspicuously identify yourself in all your dealings with clients, customers, suppliers, public officials, Office personnel, and others as the owner of the Office pursuant to a Franchise Agreement with us. You shall place, and you shall ensure that everyone affiliated with the Office places, a statement on all forms, business cards, stationery, advertising, and other materials that the Office is independently owned and operated or such other statement as we may require from time-to-time. Such a statement must also be displayed in a prominent place near the main entrance to the Office and in the reception area.

B.  **CONDUCT OF BUSINESS OF THE OFFICE.**

(1)  **You Control the Conduct of Your Business and the Office.**

You understand and agree that neither we nor International shall have any authority to exercise control over the conduct of your business and the Office, including but not limited to the time and manner in which you obtain listings and sell properties, the commission rates charged by the Office, the details of the work performed by you or your employees and agents, the hiring or termination of your employees and agents, the compensation, working hours or conditions or the day-to-day activities of such persons except to the extent necessary to protect the RE/MAX Marks and the System and the goodwill associated with the RE/MAX Marks and the System. All activity within the Office, including those described above, will be determined by you in your own judgment, subject only to the laws and regulations of the state in which the

12

RE/MAX Florida/FA
July 2007

Office is located, the terms of this Agreement, and the standards, procedures, policies and guidelines prescribed by International or us for the preservation of the goodwill associated with the RE/MAX Marks. You acknowledge and understand that such standards, procedures, policies and guidelines are not fixed, and may, from time-to-time, be modified or revised by International or us to reflect existing conditions in the highly competitive real estate services marketplace.

    (2)   **Model ICA/Essential ICA Provisions.**

For your convenience, International has developed a model independent contractor agreement ("*ICA*") for you to consider using as a framework for an independent contractor relationship with your Sales Associates. While you are not required to use the ICA developed by International, it does contain certain essential provisions ("*Essential ICA Provisions*") designed in large measure to help preserve and protect the valuable RE/MAX Marks and System standards. International's model ICA also includes other common or important provisions that are generally regarded as significant, if not necessary, in ICAs.

Although the form of agreement you use is up to you, you are required to have in place a fully executed and in force written ICA with each of your Sales Associates that includes the Essential ICA Provisions. The current Essential ICA Provisions are set out in Exhibit B attached hereto and you shall cause these Essential ICA Provisions to be incorporated into each and every ICA you enter into or renew with your Sales Associates. As future changes, additions or modifications to the Essential ICA Provisions are promulgated by International, you will have 60 days within which to amend your ICA form to include the new Essential ICA Provisions. You then shall use that amended, compliant ICA form, or some alternative compliant ICA form, for all of your new and renewal ICAs so that at the end of the twelve-month period following the amendment of your ICA, all of your Sales Associates will be parties to an ICA containing the most current Essential ICA Provisions.

C.    **NO LIABILITY, NO WARRANTIES.**

We have not authorized or empowered you to use the RE/MAX Marks except as provided by this Agreement and you agree not to employ any of the RE/MAX Marks in signing any contract, check, purchase agreement, negotiable instrument or legal obligation, application for any license or permit, or in a manner that may result in demands for payment or assertions of liability directed to us for any indebtedness or obligation of yours. Except as expressly authorized by this Agreement, neither of us will make any express or implied agreements, warranties, guarantees or representations, or incur any debt, in the name of or on behalf of the other or represent that the relationship between us is other than that of franchisor and franchisee. You acknowledge that you do not have the authority to bind or obligate RE/MAX Regional or International in any way by any promise or representation or any other action or inaction.

D.    **INDEMNIFICATION.**

You shall be solely and exclusively responsible for any fines, taxes, costs, expenses, damages, loss or liability, of any kind or nature, arising out of any suits, actions, proceedings or claims (collectively "*Claims*") relating to your business or the operation of the Office even if such Claims are brought or filed after termination or expiration of this Agreement. You agree to indemnify, defend and hold us and International, and each of our and their affiliated entities, shareholders, partners, directors, officers, employees, lawyers, agents, affiliates and assignees, harmless from and against, and to reimburse us and them for, all such fines, taxes, costs, expenses, damages, loss or liability for which we or they are held liable or which we or they reasonably incur in connection with any Claims, including, without limitation, actual and consequential damages, reasonable attorneys', accountants', and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses. RE/MAX Regional and International have the right to defend any Claims and, in connection therewith, to retain legal counsel of our or their choice. You agree to cooperate with us and International in the defense of, and not to settle or compromise, without our prior written consent, any Claims to which we or International are a party or which may affect our interests or the interests of International. Your indemnification obligations described above will continue in full force and effect after, and notwithstanding, the expiration or termination of this Agreement.

E.    **CONFIDENTIAL INFORMATION.**

You acknowledge that you have been given access to and will be informed regarding confidential matters, trade

secrets, recruiting techniques, accounting procedures, quality control procedures and other methods developed by International as part of the System which, for purposes of this Agreement, are owned by International and which are necessary and essential to the operation of the Franchise, without which you could not efficiently, effectively, and profitably operate the same (collectively the *"Confidential Information"*).   You further acknowledge that the Confidential Information was unknown to you prior to negotiation for and execution of this Agreement, and that the unique and novel combination of "know how" and methods developed by International and licensed to you by us for the operation of the Office are peculiar to the real estate business conducted by RE/MAX offices. You agree to take all steps necessary, at your own expense, to protect the Confidential Information, and shall not divulge any of the Confidential Information to any other person either during the Term or subsequent to the termination or expiration of this Agreement without our prior written consent.

### F.   EXCLUSIVE RELATIONSHIP/NON-COMPETITION AGREEMENT.

You acknowledge and agree that we would be unable to protect the Confidential Information against unauthorized use or disclosure and would be unable to encourage a free exchange of ideas and information among RE/MAX offices and RE/MAX Affiliates and between us and RE/MAX offices and RE/MAX Affiliates if you or your Owners were permitted to engage in other businesses competitive with RE/MAX offices or with us or International. Accordingly, you agree that without our prior written consent, which we have the unfettered right to withhold, neither you, your Owners or your Sales Associates, nor the immediate family members (as defined below) of you, your Owners or Sales Associates, will during the Term, directly or indirectly, as an officer, director, shareholder, partner, employee, agent or otherwise, operate, manage, own, have an interest in or become affiliated with in any other way (1) any non-RE/MAX real estate service business; or (2) any other business or enterprise offering products or services that directly or indirectly competes with the products and services offered by RE/MAX offices, RE/MAX Regional or International, or any of our or International's affiliates. For purposes of this Agreement, an *"Immediate Family Member"* shall include your spouse, significant other or life partner with whom you reside, as well as your parents, step-parents, in-laws, siblings, children and step-children and each of their immediate family members.

You agree that International's and our consent to your entering into or continuing other businesses prohibited by this Subsection 5.F. may be contingent upon amendment of this Agreement and/or immediate or future acquisition from us of a franchise covering such business.   You also agree to support the natural expansion by us and International into related service businesses including, without limitation, mortgage, insurance, property management and relocation.

## 6.   FEES.

### A.   INITIAL FRANCHISE FEE.

You agree to pay us an initial franchise fee (the *"Initial Franchise Fee"*) in the amount of $N/A (Transfer) when you sign this Agreement.   You will not be entitled to any rights or privileges under this Agreement until the Initial Franchise Fee is paid in full.   You agree that we have fully earned the Initial Franchise Fee and that it becomes non-refundable upon payment to us.

### B.   MONTHLY ONGOING FEES.

#### (1)   Component One Continuing Franchise Fee.

You agree to pay us monthly ongoing fees ("*Monthly Ongoing Fees*") consisting of two components. The first component, the Component One Continuing Franchise Fee ("*Component One Continuing Franchise Fee*"), may be referred to simply as "continuing franchise fee" on billing statements or invoices you receive. Under this component, you agree to pay us, on a monthly basis, the greater of $125.00 per month for each Sales Associate (as defined in Subsection 6.1. below), or an amount equal to one-fifth of the monthly management fee that you charge such Sales Associate, whether or not you actually collect such fee.   The Component One Continuing Franchise Fee is due and will be considered late if not received by us by the fifth day of the month after the month the Office opens and by the fifth day of each month throughout the remainder of the Term of this Agreement. We will have the right to increase the amount of the Component One Continuing Franchise Fee once in any calendar year to offset increased operating expenses, provided such increase will not exceed 20% of the Component One Continuing Franchise Fee amount in effect at the time of any such increase.

(2)    Component Two Continuing Franchise Fee.

The second component of the Monthly Ongoing Fees is the Component Two Continuing Franchise Fee ("**Component Two Continuing Franchise Fee**"), which may be referred to simply as "Broker Fee" on billing statements or invoices you receive. You agree to pay us, as a Component Two Continuing Franchise Fee, the greater of (a) 20% of all Broker Service Fees you charge your Sales Associates, whether or not you actually collect such fees or (b) an amount equal to 1% of all real estate commissions earned, derived and/or received by or generated from closed real estate transactions handled by each one of your Sales Associates. This Component Two Continuing Franchise Fee is due and will be considered late if not received by us by the fifth day of the month after the month the Office opens, and by the fifth day of each month throughout the remainder of the Term of this Agreement. We recommend, but do not require, that you charge a 5% Broker Service Fee. "**Broker Service Fee**" means that portion of gross commissions earned, derived and/or received by or generated from closed real estate transactions, including referral fees, handled by your Sales Associates that you specifically designate as a Broker Service Fee to be retained from commissions otherwise payable to your Sales Associates.

(3)    Failure to Establish or Collect Fees.

You understand and acknowledge that your failure to establish or require your Sales Associates to pay a monthly management fee or a Broker Service Fee, or your failure to actually collect such fees from some or all of your Sales Associates, does not relieve you of your obligation to remit all Component One Continuing Franchise Fee and Component Two Continuing Franchise Fee amounts making up the Monthly Ongoing Fees payable to us under this Agreement in a timely manner.

C.    **ANNUAL DUES**.

The ICA you use must require that each Sales Associate pay International annual dues in the amount of $390 (or such increased amount as provided below). You agree to enforce the dues payment obligation under the ICA to compensate International for certain benefits and services afforded by it to you and your Sales Associates and to other sales associates who are affiliates of the RE/MAX Network. Those benefits and services (the "**Benefits and Services**") provided by International include, but are not limited to: inclusion of your office name, your personal name and the names of your Sales Associates in the RE/MAX referral roster on RE/MAX Mainstreet (the "RE/MAX Web Roster"), and participation in the RE/MAX referral network, subscription and access to RE/MAX Mainstreet and the RE/MAX Internet based services provided through that website; subscription to the RE/MAX Times and access to the RE/MAX University catalog and the right to receive all free RSN programming and to receive and earn credit for RSN designation programming; eligibility for International's performance awards; eligibility to receive referrals from LeadStreet and International's Referral Department; rights to register, attend and participate in International's annual convention or other programs; and maintenance and protection of the valuable RE/MAX Marks. If any Sales Associate fails to pay in advance in a timely manner and in full the annual dues billed directly by International to your Sales Associate, you agree to timely pay such annual dues in full on behalf of such Sales Associate. The first annual dues payment for each Sales Associate is deemed to be included in the initiation fee, if any, and in any case, such initial annual dues must be forwarded by you to International along with the Membership Profile Form within five days of the date such Sales Associate's license is first registered with the Office or the date the new Sales Associate is first qualified to engage in real estate services for the Office, whichever is earlier; and all subsequent payments shall be due to International on or before each anniversary date of the day the initial dues are paid respecting the Sales Associate. Although Sales Associates may be billed directly by International for these dues, you understand and acknowledge that such direct billing will not relieve you of your obligation to pay International directly the annual dues amount for each Sales Associate affiliated with the Office who fails to timely pay their annual dues in full. You understand, acknowledge and agree that International is a third party beneficiary of your obligation to pay these dues to International. You also understand that International may, once in any calendar year, increase the amount of annual dues described above to offset its operating expenses. However, the increase will not exceed 20% of the then existing dues amount. You agree to make all payments due to International under this Section in amounts as International may designate from time-to-time and you agree to make all payments under this or any other Section of this Agreement to RE/MAX International, Inc., at P.O. Box 3907, Englewood, Colorado 80155, or to such other address as International may designate during the Term of this Agreement.

D.    **REGIONAL AND INTERNATIONAL ADVERTISING FUNDS.**

(1)    **Regional Group Advertising Fund.**

You agree to pay us a Regional Group Advertising Fund ("*RGAF*") fee of $125 per month with respect to each Sales Associate (except that in regard to each licensed assistant, you are responsible to pay only that amount which is equal to the portion of the RGAF allocated to the RE/MAX International Advertising Development Fund, Inc. as set forth below). This fee is due and will be considered late if not received by us by the fifth day of the month after the month the Office opens and by the fifth day of each month throughout the remainder of the Term of this Agreement. You understand that your failure to collect this fee from some or all Sales Associates does not relieve you of your obligation to remit the required amount to us in a timely manner.

(2)    **International Advertising Development Fund.**

$40 (or such increased amount as International may specify from time-to-time) of the RGAF monthly fee due with respect to each Sales Associate will be allocated to a separate national advertising and promotion account within the RE/MAX International Advertising Development Fund, Inc. ("*RE/MAX International Advertising Development Fund*" or "*IADF*") to be used for purchases of national media and Internet advertising and promotion. $5.00 or such increased amount as International may specify from time-to-time (but such increase not to exceed an additional $5.00 per month in any calendar year) of the RGAF monthly fee due with respect to each Sales Associate will be allocated to a separate IADF creative and promotional account to be used for the creation and production of advertising and public relations programs and materials. $1 of the RGAF monthly fee (or such increased amount as International may specify from time-to-time) due with respect to each Sales Associate will be allocated to a separate reserve advertising account and will be used for special, high profile advertising opportunities requiring swift action.

(3)    **Use of RGAF and IADF Funds.**

All funds within the IADF, and any interest, dividends, capital gains or other income earned on such funds, will be accounted for separately from other funds of International and will be spent on items relating to the creation, distribution and placement of advertising and public relations programs and related materials including a small portion for salaries of employees of the IADF and other administrative expenses reasonably related to the direction and implementation of the IADF's advertising purposes. All IADF funds become the non-refundable property of the IADF. The remaining funds in the RGAF, and any interest, dividends, capital gains or other income earned on such funds, will be accounted for separately from our other funds and will be used for institutional advertising and promotion for the benefit of those RE/MAX offices operating within our region. A small portion of the RGAF will be used to pay salaries of employees of the RGAF and other administrative expenses reasonably related to the direction and implementation of the RGAF's advertising purposes. All RGAF funds become the non-refundable property of the RGAF. The monthly RGAF fee due with respect to each Sales Associate may be increased by us once in any calendar year, but not by more than an additional $30 per month.

E.    **SATELLITE OFFICE FEE.**

You agree to pay us a non-refundable $5,000 fee for each Satellite Office you establish.

F.    **PAYMENT/LATE CHARGES/INTEREST.**

If you fail to make any payments to us or International by their due date, you agree to pay us or International as the case may be: (a) a late charge equal to 20% of the amount owed, or if such rate exceeds the highest rate permitted by applicable law, then at the highest rate permitted by applicable law, to compensate us or International for the additional administrative costs and expenses incurred in handling overdue payments; and (b) simple interest on all amounts owed but unpaid at the rate of 18% per year, or if such rate exceeds the highest rate permitted under applicable law, then at the highest rate legally permitted. If we or International are ever deemed to have contracted for, charged or received interest on any overdue sums in an amount that exceeds the amount permitted under applicable law, then such excess amount shall be deemed intended for, and will be applied as, payment of outstanding fees or other amounts due under this Agreement and, if no such amounts remain outstanding, such excess shall be returned to you.

You agree to comply with any requirement we may impose to the effect that certain or all fees, dues and charges specified in this Section 6 be paid by wire transfer, direct deposit, automated clearinghouse ("*ACH*") transfer, or by such other means and in accordance with such procedures as we may specify from time-to-time.

G.    **APPLICATION OF PAYMENTS.**

When we or International receive a payment required under this Section 6, we or International have the unfettered right to apply it as we see fit to any past due indebtedness of yours under this Section 6, including late charges or interest due, *all without regard to how you designate or direct that a particular payment be applied.*

H.    **SUSPENSION OF SERVICES.**

If you fail to make any payments to us or International as required under this Agreement then, in addition to the assessment of late charges and interest as set forth above, we and International shall have the right to suspend, during such period of delinquency, any or all benefits and services set forth under Section 9 of this Agreement *as well as any other benefits and services afforded you as a RE/MAX franchisee* including, but not limited to: placement in the RE/MAX Web Roster and the remax.com web site; access to RE/MAX Mainstreet; subscriptions to the RE/MAX Times and RE/MAX University catalog; eligibility for RE/MAX International performance awards; eligibility to receive referrals from LeadStreet or International's Referral Department; and rights to register, attend or participate in International's annual convention and other conferences. Suspension of these or any other benefits and services shall not be an exclusive remedy and shall not in any way affect our rights to receive or collect all outstanding fees, dues and other amounts owed by you or to terminate this Agreement because of your failure to make payments required under this Agreement.

I.    **SALES ASSOCIATE DEFINED.**

For purposes of this Agreement, *"Sales Associate"* means each person who possesses a state real estate license that is registered with the Office or any Satellite Office including, but not limited to, sales associates, broker associates, brokers, licensed assistants and each broker of record and/or manager.

J.    **REPORTING OF SALES ASSOCIATES.**

On or before the fifth day of each month, you agree to report to us, on such form as we may prescribe from time-to-time, the identity of each Sales Associate who holds a real estate license that is registered with your Office, or that is lawfully engaged in providing real estate services for you or your Office as of the date you complete the report, and to submit with such report all payments due with respect to each Sales Associate, as provided in this Section 6. A failure to report Sales Associates in a timely manner as required by this Subsection 6.J. shall be deemed a material default of an essential provision of this Agreement that gives us the option of pursuing termination of this Agreement pursuant to Section 13 or, in the alternative, accepting payments of back fees and dues, plus any and all applicable late charges and interest, pursuant to Subsection 6.F. You agree to pay the back fees and dues, plus any and all applicable late charges and dues, if RE/MAX Regional offers that alternative to termination.

K.    **SURVIVING FINANCIAL OBLIGATIONS.**

In the event of an early termination of this Agreement, which for purposes of this Subsection shall mean any termination of the Agreement by us for cause (Subsection 13.A.), or for any other reason than pursuant to mutual consent ("*Early Termination*"), you shall immediately become obligated to pay us for lost future revenue ("*Lost Future Revenue*"). Lost Future Revenue shall consist of all amounts which you would have been obligated to pay as Monthly Ongoing Fees, Annual Dues, and Regional and International Advertising Fund fees, from the date of Early Termination through what would have been the end of the Term (the *"Termination Date"*). We and you acknowledge that it would be impracticable or extremely difficult to calculate the actual amount of Lost Future Revenue payable by you, and that the following method of calculation represents a fair and reasonable estimate of foreseeable Lost Future Revenue:  Lost Future Revenue shall be equal to the combined monthly average of Monthly Ongoing Fees, Annual Dues, and Regional and International Advertising Fund Fees payable under this Agreement from the effective date of this Agreement through the date of Early Termination, multiplied by the number of months (or partial months) remaining in the Term of this

Agreement. The present value of the total of these amounts calculated at a discount rate of 8%, assuming payment is made within 30 days of Early Termination, shall constitute our Lost Future Revenue.

7.     **QUOTA.**

You agree to have the following minimum number of Sales Associates in your Office by the dates and during the periods set forth below ("*Quota*"):

(1)     Thirty (30) Sales Associates by the end of the first 12-month period after the Agreement Date and during each month thereafter through the 24th-month after the Agreement Date;

(2)     Thirty (30) Sales Associates commencing the first day following the expiration of the 24-month period following the Agreement Date and during each month thereafter through the 36th-month after the Agreement Date; and

(3)     Thirty (30) Sales Associates commencing the first day following the expiration of the first 36-month period after the Agreement Date and during each month thereafter through the remainder of the Term.

Only Sales Associates who have not been affiliated with the RE/MAX network of real estate offices for at least twelve months prior to their affiliation with you will be counted towards the satisfaction of your Quota requirements set forth above.

Notwithstanding any failure by you to satisfy your Quota, you will not be excused from the payment of, and you agree to pay, all Continuing Franchise Fees, advertising fees and contributions and annual dues to us or International as if you had met your Quota.

8.     **BUSINESS IMAGE AND OPERATING STANDARDS.**

A.     **APPEARANCE OF OFFICE.**

You agree to maintain the appearance of the Office consistent with the image of a RE/MAX office business as a modern, clean, attractive and efficiently operated facility. You agree to take steps as reasonably required from time-to-time to maintain such appearance and efficient operation, including, without limitation, interior and exterior repair and cleaning of the premises of the Office; replacement of worn out or obsolete leasehold improvements, fixtures, equipment or signs; and periodic decorating.

B.     **SYSTEM STANDARDS AND OPERATIONS MATERIALS.**

We or International will issue to you during the Term of the Franchise one or more printed or electronic copies of an operations manual or manuals or similar materials containing trademark, graphic and other standards, recommendations, procedures, policies, guidelines, and other information relating to your obligations under this Agreement, your use of the RE/MAX Marks and the general operation of the Office (the "*Operations Materials*"). The entire contents of the Operations Materials will remain confidential and the property of International and must be returned to us upon expiration or termination of this Agreement. We and International will have the right to add to and otherwise modify the Operations Materials from time-to-time, if deemed necessary to improve the standards of service or quality or the efficient operation of the Office, to protect or maintain the goodwill associated with the RE/MAX Marks or to meet competition. Such additions or modifications may be made by amendment or supplement to the Operations Materials or by bulletins, notices or other written or electronic materials as we and International may publish from time-to-time. No such addition or modification, however, shall alter your fundamental status and rights under this Agreement. This Agreement and the Operations Materials govern certain general aspects (but not the day-to-day operation) of the Office including, without limitation:

(1)     general appearance and maintenance of the Office;

(2)     standardization of signs, letterheads, business cards and other similar promotional materials;

(3)     use of the RE/MAX Marks and protection of Confidential Information;

(4)     types, models and brands of authorized equipment, supplies and approved suppliers;

(5)     use of recommended forms;

(6)     use of computer hardware and software;

(7)     adoption of technological developments or advancements; and

(8)     the addition of new services and modification to existing services.

You acknowledge and agree that the development and operation of the Office in accordance with the System, this Agreement and the Operations Materials is essential to preserve the reputation and high standards of quality and service of RE/MAX offices and the goodwill associated with the RE/MAX Marks. You further acknowledge and agree that the recommendations, standards, procedures, policies and guidelines contained in the Operations Materials have been established for the purpose of preserving such reputation, standards and goodwill, but do not, and are not intended to, govern or control the day-to-day affairs, activities or business of the Office or the means and manner by which you conduct the operations of the Office, which shall always be your responsibility and subject to your discretion and control.

C.      **COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES.**

You acknowledge that it is your sole responsibility to secure and maintain in force all required licenses, permits and certificates relating to the operation of the Office and to operate the Office in full compliance with all applicable laws, ordinances and regulations, including, without limitation, those relating to real estate service businesses, brokers and salesmen; occupational hazards; health, workers' compensation and unemployment insurance; the Americans with Disabilities Act; and withholding and payment of federal and state income taxes, social security taxes and sales and service taxes. All of your advertising and promotion, and the advertising and promotion of your Sales Associates, and any other advertising and promotion emanating from your Office, must be completely factual and conform to the highest standards of ethical advertising.

In all of your dealings with clients, customers, suppliers, us, International and the public, you must adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to promptly respond to all complaints received from your customers, clients or other individuals, in an attempt to resolve any disputes in a reasonable business manner. You agree to refrain, and to ensure that your Sales Associates and any other persons affiliated with your Office refrain, from any business or advertising practice which may be injurious to our or International's business and the goodwill associated with the RE/MAX Marks and other RE/MAX offices. You agree to notify us in writing within five days of the receipt of any notice of violation of any law, ordinance, or regulation relating to the Office, or the commencement of any action, suit or proceeding, or of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect you or your financial condition or the operation of the Office.

D.      **INSURANCE.**

You shall at all times during the Term of the Franchise, and any renewals thereof, maintain in force at your sole expense the following insurance coverage:

(1)     Workers' compensation insurance for employees in amounts prescribed by law;

(2)     Comprehensive general liability insurance insuring against claims for bodily and personal injury, and death and property damage, caused by or occurring in conjunction with the operation of the Office or otherwise in conjunction with the conduct of business by you pursuant to the Franchise, in the face amount of not less than one million dollars ($1,000,000) per occurrence or claim;

(3)     Umbrella commercial liability insurance in the face amount of not less than one million dollars ($1,000,000) aggregate;

(4)     Errors and omissions insurance in the face amount of not less than one million dollars ($1,000,000) per occurrence or claim;

(5)     You must also maintain automobile liability insurance covering each vehicle titled or leased in the name of the Franchise or any of its Owners and used at any time for the business of the Franchise. You shall ensure that each such automobile liability insurance policy names us and International (and our respective officers, directors, and employees) as additional insureds, contains a waiver by the insurance carrier of all subrogation rights against us, International, and other parties covered by the insurance and provides that we receive thirty (30) days prior written notice of termination, expiration, cancellation or modification of such policy. Each such automobile liability insurance policy must have (i) a combined single limit of liability for bodily injury and property damage of at least $500,000; or (ii) bodily injury liability insurance having limits of at least $250,000 per person and a minimum of $500,000 per occurrence and property damage liability insurance having limits of at least $100,000 per occurrence; and

(6)     A commercial, hired, non-owned automobile policy in the face amount of at least one million dollars ($1,000,000).

All insurance policies required to be obtained pursuant to this provision shall name us and International (and our respective officers, directors and employees) as additional insureds, contain a waiver by the insurance carrier of all subrogation rights against us and other parties covered by the insurance and shall provide that we receive 30 days prior written notice of termination, expiration, cancellation or modification of any such policy.

All insurance coverage required pursuant to this subsection shall be maintained under one or more policies of insurance of the types, and containing such terms and conditions, as are specified from time-to-time by us and issued by insurance carriers approved by us. Your insurance policies must be with an insurance company that has a current A.M. Best's rating of at least an A- and an A.M. Best's financial size category of at least XII.

We may from time-to-time increase the minimum amount of coverage required under any policy, and require different or additional kinds of insurance to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards or other relevant changes in circumstances.

You must secure endorsements, on forms acceptable to us, covering your Sales Associates under the insurance policies required under this provision or, in the alternative, you must ensure that each Sales Associate secures such insurance. Without limiting the foregoing, you must ensure that each Sales Associate in your Office obtains automobile liability insurance covering each vehicle used at any time by the Sales Associate for the business of the Franchise or Sales Associate. You shall use your best efforts to ensure that each such automobile liability insurance policy names us and International (and our respective officers, directors, and employees) as additional insureds, contains a waiver by the insurance carrier of all subrogation rights against us, International, and other parties covered by the insurance and provides that we receive thirty (30) days prior written notice of termination, expiration, cancellation or modification of such policy. Each such automobile liability insurance policy must have (i) a combined single limit of liability for bodily injury and property damage of at least $500,000; or (ii) bodily injury liability insurance having limits of at least $250,000 per person and a minimum of $500,000 per occurrence and property damage liability insurance having limits of at least $100,000 per occurrence.

You must furnish to us a copy of the certificate of or other evidence of the procurement, renewal or extension of each above referenced insurance policy at least thirty (30) days prior to the effective date of such procurement, renewal or extension. If you at any time fail or refuse to maintain in effect any insurance coverage required by us, or to furnish satisfactory evidence of such insurance, we may, at our option and in addition to any other rights and remedies we may have under this Agreement, obtain such insurance coverage on your behalf, although we are under no obligation to do so. You agree to fully cooperate with us in our efforts to obtain such insurance policies, promptly execute any and all forms or instruments required to obtain any such insurance, allow any inspections of the premises of the Office which are required to obtain such insurance, and reimburse us, on demand, any costs and premiums incurred by us.

With regard to errors and omissions insurance, you agree to purchase an extended reporting period endorsement (also known as tails insurance) covering a period of three (3) years after the expiration, termination or transfer of this

Agreement, which endorsement shall be consistent with all of the conditions set forth in this Subsection for errors and omissions insurance coverage, including without limitation, the requirement to name us and International as additional insureds.

Your obligation to obtain and maintain the insurance described above shall not be limited in any way by reason of any insurance maintained by us or International, nor will your performance of such obligations relieve you of any obligations under Section 5 of this Agreement.

E.    **ORGANIZATION OF FRANCHISE OWNER.**

If you are a Business Entity, you represent and warrant to us that you are duly organized and validly existing in good standing under the laws of the state of your incorporation, organization, or registration, that you have the authority to execute, deliver and carry out all of the terms of this Agreement, and that during the Term of this Agreement the only business you (i.e., the Business Entity) will conduct will be the development, ownership and operation of the Office. You and each Owner represent, warrant and agree that all "interests" (defined in Subsection 12.B. below) in Franchise Owner are owned in the amount and manner described in Exhibit A, that all information set forth on Exhibit A is true and accurate and that the shareholders, partners, members, officers and directors of the Business Entity are fully described therein. You and each Owner further represent, warrant and agree to amend Exhibit A to keep it accurate and current at all times, and to promptly provide us with all amendments of Exhibit A. You shall provide us with copies of your certificate of incorporation, registration or articles of organization, as the case may be, as well as copies of your by-laws, partnership or operating agreements, buy-sell agreements and any other relevant documents we request. The articles of incorporation, by-laws, articles of organization, partnership agreement and other organizational documents of such Business Entity shall recite that the issuance and transfer of any interest therein is restricted by the terms of Section 12 of this Agreement and all issued and outstanding stock certificates or certificate of membership interest or other evidence of ownership of any such Business Entity shall bear the following clause restricting transfer:

"The transfer of this stock (or other interest) is subject to the terms and conditions of the franchise agreement between this corporation (or other entity) and RE/MAX Florida Region. These restrictions prohibit transfer without the prior written approval of RE/MAX Florida Region."

F.    **MANAGEMENT OF THE OFFICE.**

You or one of your principal Owners agree at all times to hold a valid state real estate broker license or to secure the services of a validly licensed real estate broker under whose license the Office will be conducted (the "*manager*"). Such person shall devote his or her full time and best efforts to the management and supervision of the Office. You agree to ensure that all of your Sales Associates are supervised by the manager, and that the manager will be charged with responsibility for continuing personal guidance, oversight, day-to-day management, orientation, instruction and supervision of your Sales Associates, and for receipt and timely, appropriate processing of requests, reports or complaints respecting the conduct and professional performance of your Sales Associates. You and the manager shall scrupulously observe and adhere to your state's regulations affecting real estate brokers and salesmen. You agree to respond promptly to customer complaints and shall take such other steps as may be required to insure positive customer relations.

G.    **TRAINING.**

You or one of your principal Owners shall, at your expense, attend in its entirety and successfully complete, prior to the opening of the Office or within 30 days of the Agreement date, whichever is sooner, the next scheduled RE/MAX Management Training Course conducted for new RE/MAX office franchisees by International in Denver, Colorado or such other place as International shall reasonably designate. In addition, prior to renewal of the Franchise, you or one of your principal Owners shall, at your expense, complete the RE/MAX Broker/Owner Advanced Education Course or other training required by us (or provide us with evidence that you or such Owner has satisfied requirements equivalent to such course or training).

H.    **PROFESSIONAL MEMBERSHIPS.**

You agree that you and each of your Sales Associates will join and remain a member in good standing and comply with the by-laws and rules and regulations of a local Board of REALTORS® (or comparable organization) and,

where available, you will become and remain a participant in a board owned multiple listing service. You also agree that you and your Sales Associates will abide by the Code of Ethics of the National Association of REALTORS®.

### I.   RE/MAX REFERRAL SYSTEM.

You acknowledge the importance of the RE/MAX Referral System as an integral part of the System and to the success of RE/MAX offices. Accordingly, you will refer requests for real estate services in another city to a RE/MAX office for that city. If there is no RE/MAX office located in such city, you will refer each such request to International's Referral Department. International will establish procedures and make appropriate forms available to facilitate referrals between you and other RE/MAX offices and RE/MAX Affiliates.

You agree not to offer, or allow any of your Sales Associates to offer to members of the RE/MAX organization, or to engage or to allow any of your Sales Associates to engage in the business of offering to consumers or other industry practitioners, any office or agent locator or referral service which uses the RE/MAX Referral Roster (or RE/MAX Web Roster) or which competes with the services made generally available by International to the RE/MAX network as a benefit of affiliation. This provision shall not be construed to prohibit or discourage (i) any RE/MAX Affiliate from referring a local real estate brokerage customer or client to any other RE/MAX Affiliate anywhere in the world; (ii) the creation of RE/MAX agent to RE/MAX agent reciprocal referral relationships between two geographic areas or two cities; (iii) any RE/MAX Affiliate from advertising or promoting himself/herself as a provider of real estate brokerage services in his/her local real estate market; or (iv) any RE/MAX Affiliate from inviting or soliciting referrals to himself/herself for real estate brokerage services in his/her local market area.

### J.   BROKER/OWNER COUNCIL.

You agree to join, maintain membership at your expense, and actively participate in any Broker/Owner Council we may establish. You agree to abide by all rules and regulations as may be established for the Council, including any decision reached in accordance with the rules and regulations of the Council. The Broker/Owner Council is a group comprised of all broker/owners within the region who meet on a regular basis throughout the year to discuss common issues that affect them, and to exchange ideas on topics such as education, advertising, public relations, communications and current issues affecting the real estate industry.

### K.   SUPPLIES AND PROMOTIONAL MATERIALS.

International prescribes standards respecting the nature and quality of the supplies and promotional materials that bear the RE/MAX Marks that you use in the operation and promotion of the Office. Although neither you nor your Sales Associates are required to purchase supplies or promotional materials from a source approved by International, we encourage you to do so. If you or your Sales Associates obtain supplies or promotional materials from sources other than a source approved by International, you agree to ensure that they are of at least the same quality as are available from sources approved by International. You shall ensure that all such materials and supplies, including without limitation, all advertising, promotional and marketing materials and all stationery and signage that you use or that are used by your Sales Associates comply with the standards and guidelines established by us or International for proper use of the RE/MAX Marks including, without limitation, the standards and guidelines set forth in the Trademark Manual. You understand and agree that neither we nor International assume any liability for the acts or omissions, or guarantees the performance, of any supplier, whether approved or not.

### L.   MODIFICATIONS AND IMPROVEMENTS TO SYSTEM.

International may change the System or any part of the System at any time, and such changes shall become part of the System referred to in this Agreement. Any improvements in the System that may be developed by you shall be dedicated, conveyed to and become the sole and exclusive property of International, which will have the right to adopt and perfect such improvements without compensation to you.

### M.   REAL ESTATE LISTINGS AVAILABLE VIA REMAX.COM.

In order to promote and enhance the RE/MAX name and to encourage members of the public to use RE/MAX real estate services, International has developed and hosts the web site remax.com. Among the services and types of

information available via remax.com are all the real estate listings in thousands of cities and towns throughout the United States. You understand and acknowledge that one of the purposes of remax.com is to encourage members of the public to use remax.com as a source of information for their real estate needs, and that the success of remax.com in attracting consumers depends on full participation by all RE/MAX offices. Accordingly, you agree that unless instructed otherwise by the client, you will give any authority, consent or instructions required, and otherwise use your best efforts, to ensure that all of your Office real estate listings, including those of your Sales Associates, are made available to remax.com and that neither you nor your Sales Associates will decline, or opt out of, any opportunity to have each such listing entered on or forwarded to remax.com. With respect to pictures or other media that you supply to us (including those intended for use in listings on remax.com), to the extent the copyright of any such picture or other media is owned by you, you grant us a fully paid up and royalty-free license and right to use and sublicense such pictures and other media for any purpose we deem appropriate in any media now in existence or hereafter created. To the extent that you do not own the copyright in such pictures or other media, you represent and warrant that you have permission to use such pictures and other media and to authorize the uses contemplated by this paragraph, and agree to indemnify and hold us harmless against any claims by any third party that our use infringes upon such third party's rights.

N.   **MAINTAINING INDEPENDENCE, AVOIDING CONFUSION AND ADVERTISING COMMISSIONS.**

You should maintain the independence of your Office in determining the commission rates charged. You and your Sales Associates shall refrain from any comment, advertising, or other conduct that could lead consumers to believe that the commission rates or fees of RE/MAX offices or agents are uniform, set at any specific level, or are not negotiable. In order to avoid consumer confusion about commission rates and fees and in marketing services to be rendered, the advertising of commission rates and fees is discouraged. However, in the event that you elect to advertise commission rates or fees, or allow others affiliated with your Office to advertise commission rates or fees, and the advertisement includes the RE/MAX name and/or RE/MAX marks, the advertisement shall also include the following notice to the public in a typeface at least one-half the size of the largest typeface used in the advertisement to specify the commission rates or fees being offered: "Different commission rates, fees and listing and marketing services may be offered by other RE/MAX Franchisees and sales associates serving this market area." In addition, it shall be the responsibility of the party advertising commission rates or fees to ensure that potential clients fully understand the listing and marketing services that will be provided by that party in the market area.

O.   **REPRESENTATION AND COVENANT CONCERNING TERRORISM.**

You and your Owners acknowledge that the President of the United States of America has issued Executive Order 13224 (the "*Executive Order*") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "*Anti-Terrorism Measures*"). RE/MAX Regional, therefore, requires certain certifications that the parties with whom it deals are not directly or indirectly involved in terrorism.

Therefore, you and your Owners certify that neither you nor any of your employees, Sales Associates or representatives nor any other person or entity associated with your Office is:

(1)   a person or entity listed in the Annex to the Executive Order; or

(2)   a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as "*Terrorists*"); or

(3)   a person or entity who assists, sponsors or who supports Terrorists or acts of Terrorism ("*Sponsors of Terrorism*"); or

(4)   owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, you and your Owners covenant that neither you or your Owners, nor any of your employees, Sales Associates or representatives nor any other person or entity associated with your Office shall, during the Term of this Agreement, become a person or entity described in clause (1), (2) or (3) above, or shall otherwise become a target of any

*Anti-Terrorism Measure.* Should you or any of your Owners, or any employee, Sales Associate, or any representative of your Office, violate this provision, RE/MAX Regional will have the right to immediately terminate this Agreement (see Subsection 13.B.(11)).

9.   **GUIDANCE AND ASSISTANCE.**

A.   **TRAINING.**

You or your Owner responsible for the Office will be provided with a mandatory five-day training program at the headquarters of International prior to the opening of the Office. The training program will cover the broad operational spectrum of a RE/MAX office franchise including, but not limited to: office and business establishment, recruiting and growth methods, fiscal management, internal and external promotion, support staff training and exposure to approved suppliers and standards. Teaching methods and tools utilized will include: operations manuals, the recruiting presentation series, extensive audio and visual materials, slides and overhead usage. Additional techniques and training aids include blank forms for record keeping and fiscal management, stationery, sales aids and personal promotion material, independent contractor agreement examples, suggested advertising examples and criteria, and public relations articles. Other than materials of general usage, such as the slide presentation, you or your Owner attending the training program will be *entitled to use the materials and forms distributed, on a loan basis only.* These materials must be returned to us upon termination or expiration of this Agreement.

B.   **OPENING ASSISTANCE.**

Prior to the opening of the Office, we will make available to you standards, operating procedures, *policies and guidelines* to familiarize you with the System and to assist you in the opening of the Office. These materials will also provide you with guidelines for standardization of signs, letterheads, sales, promotion, office design and other similar materials. In addition, if requested, we will assist you, at your expense, with your open house, office design and layout, conversion of sales staff, meeting with the Board of REALTORS®, meeting with the real estate commission, and with your initial publicity and advertising campaign.

C.   **ADVERTISING AND PROMOTION.**

We will collect monies paid to, control and administer the Regional Group Advertising Fund described in Subsection 6.D. of this Agreement. We will have the unfettered right to allocate these funds towards maintenance and administration of the fund and the preparation and placement of local or regional advertising materials, programs and public relations activities. Such advertising will be disseminated through television, radio, billboard, magazine, newspaper and other media campaigns. We will also collect monies for allocation to the RE/MAX International Advertising Development Fund described in Subsection 6.D. of this Agreement. International will control and administer the RE/MAX International Advertising Development Fund. You understand that the Regional Group Advertising Fund administered by us and the RE/MAX International Advertising Development Fund administered by International are intended to maximize general public recognition of the RE/MAX Marks and the System and services offered by RE/MAX offices. Neither we nor International undertake any obligation to ensure that expenditures by the Regional Group Advertising Fund or the RE/MAX International Advertising Development Fund (together, referred to as the *"Funds"*) are proportionate or equivalent to the contribution to these Funds by RE/MAX offices or that any RE/MAX office will benefit directly or in proportion to its contribution to these Funds from the development of advertising and marketing materials or the placement of advertising by these Funds. Neither we nor International has any fiduciary obligations to you or any other RE/MAX office in connection with the establishment *of these Funds or the collection,* control or administration of monies paid into them and we and International expressly disavow the existence of any such fiduciary relationship.

D.   **CONSULTATION AND EDUCATIONAL COURSES.**

We will make available to you at the Office, on a reasonable basis, consultation and guidance relating to the management and operation of the Office. We will have the right to charge you, and you agree to pay our per diem rate and all travel, lodging, meals and related expenses incurred by us for any consulting services provided to you beyond the services ordinarily provided by us to RE/MAX offices. The time and frequency of any such services will be subject to the availability of our personnel. In addition, from time-to-time, various educational courses and other assistance will be

made available in such areas as fiscal management, office operations, recruiting and retention of Sales Associates and financial planning.

### E. SYSTEM RECOGNITION AND PROMOTION.

We will encourage through our efforts and in conjunction with the efforts of International the use of the RE/MAX Marks and the System and RE/MAX real estate services on a national and international basis. To this end, International has established and maintains a national and international referral system which will be made available to you and in which you will be obligated to participate.

### F. CONVENTIONS AND SEMINARS.

You will be entitled to attend annual conventions held by International and conferences conducted by us or International designed to enhance the image of the System and to assist franchisees in recruiting potential Sales Associates and to provide a forum for the exchange of ideas and information on the operation of RE/MAX offices. Attendance at all such conventions and conferences is highly recommended. You will be responsible for payment of all travel, meals and lodging expenses if you elect to attend these conventions and conferences and will be charged a registration fee, currently ranging from $315-$800 per person, which includes educational, conference and registration materials. Nominal fees or charges may also be assessed for a variety of other social functions, as well as for educational and certification classes for obtaining professional credits.

### G. CATALOGS AND PROFESSIONAL PUBLICATIONS.

You will be entitled to receipt of any publications produced and distributed by International to recognize the achievements of RE/MAX Sales Associates and to highlight recent and future events that are of interest to RE/MAX Affiliates. Additionally, International currently publishes and makes available to all members of the System, an Approved Supplier Catalog and an online web roster (the "*RE/MAX Referral Roster*") on RE/MAX Mainstreet. All information contained in the Catalog and RE/MAX Referral Roster is owned by International and is considered confidential and proprietary.

## 10. RECORDS AND REPORTS.

### A. ACCOUNTING AND RECORDS.

During the Term, you agree to establish and maintain record keeping and accounting systems conforming to the requirements prescribed by us from time-to-time. All books and records of the Office shall be maintained at the Premises.

### B. REPORTS.

You agree to furnish us in the form we prescribe from time-to-time: (1) within 5 days after the close of each calendar month a statement listing each Sales Associate whose license is registered with your Office and, for each Sales Associate, the gross commissions earned and the number of transactions closed; (2) immediately upon a Sales Associate's termination, a status change form (or such other form as we may designate) reflecting the termination. If you fail to timely report the termination of a Sales Associate, you will be billed for, and required to pay, Monthly Ongoing Fees and Regional and International Advertising Fund fees for each month the Sales Associate was not in your Office until the date you report the Sales Associate terminated; (3) within 60 days after the close of your fiscal year for federal income tax purposes, a financial statement containing a balance sheet and results of operations, including gross sales and revenues for such year; and (4) such other reports as we may prescribe from time-to-time. All reports, financial statements and information shall be on forms prescribed or approved by us and shall be verified and signed by you and your chief financial officer.

### C. OTHER INFORMATION.

No reports and records or other information supplied to International or us shall be considered confidential. We and International shall have the right to use information derived from that supplied by you for our own business purposes,

to disclose such information as may be required by law and governmental authority, and to aggregate such information with other franchise information and disclose such aggregated information as we deem appropriate. You will provide us or International and/or cooperate with us or International in collecting other information as we or International may reasonably request, including information for research and development of services, products and programs, identification or demographic information, industry reports, and preparation of the Uniform Franchise Offering Circular.

11.   **INSPECTIONS AND AUDITS.**

A.   **ACCESS TO RECORDS.**

To determine whether you are complying with this Agreement, we will have the right at any time during business hours, and upon notice as provided below, to inspect, audit and copy, or cause to be inspected, audited and copied, at your Office or such other place where your records may be located, the business and accounting records of the Office, including but not limited to closed property transaction files, journals, orders, receipts, and other data relating to the operation of your Office, including the books and records of: (I) any business whose funds may be commingled with the funds of the Office; (ii) any business operated at the same location as the Office; or (iii) any other business using the Marks. As part of any such inspection and audit, we also have the right to interview Office personnel and staff, and conduct such other tests, reviews and inspections deemed desirable by us. You will cooperate, and you must ensure that everyone affiliated with your Office cooperates, with us or our representatives (including but not limited to independent accountants) that may be hired by us to conduct such inspection, interviews or audit, and you will permit us or our representatives to take photographs, videos, or other electronic recordings of the Office.

We will provide you with not less than 48 hours advance notice of any inspection and audit, except if a circumstance arises where we believe that criminal, unethical or other activity that adversely affects—or is likely to adversely affect—the reputation or image of the RE/MAX name or the goodwill associated with the RE/MAX Marks is occurring in your Office. In such event, we shall have the right at any time during business hours, without notice to you, to conduct an inspection and/or audit of the business and accounting records of your Office.

B.   **AUTHORIZATION FOR RELEASE OF RECORDS; AUTHORIZATION TO CONDUCT CREDIT REPORT AND BACKGROUND CHECK.**

You authorize any federal, local or state body regulating or supervising real estate brokerage practices to release to us all records and information it maintains for your Office including the names of Sales Associates licensed with your Office, complaints filed against you or anyone affiliated with your Office or information pertaining to any disciplinary actions taken against you or anyone affiliated with your Office. You also authorize us to conduct a credit report and/or criminal background check on you or anyone affiliated with your Office if we have reason to believe any criminal or unethical activity is occurring in your Office or if we have reason to believe that other activity is occurring in your Office that adversely affects or is likely to adversely affect the reputation or image of the RE/MAX name or the goodwill associated with the RE/MAX Marks. You agree to fully cooperate with us in accessing information maintained by the regulatory authorities and conducting a credit report or criminal background check and, to that end, you agree to provide us with such information, execute such documents or take such other action as we deem necessary.

C.   **UNDERSTATEMENT OF AMOUNTS OWED/COST OF INSPECTION OR AUDIT.**

In the event any such inspection or audit reveals an understatement of any fees, payments or amounts owed to us or International, you must pay, within 10 days after receipt of the inspection or audit report, all such fees, payments or amounts plus interest at the rate provided in Subsection 6.F. hereof from the date originally due until the date of payment. Further, in the event an inspection or audit is made necessary by your failure to furnish reports, supporting records, or other information, as required by this Agreement, or to furnish reports, records, and information on a timely basis, or if an understatement of any amounts owed to us or International for any three-month period is determined by the audit or inspection to be greater than 5%, or if the inspection reveals other conduct that is in any way unlawful or in breach of this Agreement, you must reimburse us for the cost of the audit or inspection, including, without limitation, the charges of any of our representatives (including but not limited to independent accountants) and the travel expenses, room and board, and compensation of our employees. The foregoing remedies are in addition to all other remedies and rights we may have under this Agreement or under applicable law.

12.  **TRANSFER AND ASSIGNMENT PROVISIONS.**

A.  **TRANSFER BY RE/MAX REGIONAL.**

This Agreement is fully transferable by us and will inure to the benefit of any person or entity to whom it is transferred, or to any other legal successor to our interest in this Agreement. Following the effective date of transfer or assignment, you shall look solely to the transferee or assignee, and not to us, for the performance of all obligations contained in this Agreement. We will not be required to obtain your consent in connection with any such transfer or assignment. You agree to execute any documents and take such other action required or deemed necessary by RE/MAX Regional or its transferee or assignee to effect such transfer or assignment.

B.  **NO TRANSFER OR ASSIGNMENT BY YOU OR YOUR OWNERS WITHOUT APPROVAL.**

You understand and acknowledge that the rights and duties created by this Agreement are personal to you, or if you are a Business Entity, your Owners, and that we have entered into this Agreement in reliance upon the individual or collective character, skill, aptitude, business ability, and financial capacity of you or, if appropriate, your Owners. Accordingly, neither this Agreement, the Franchise, all or a substantial portion of the assets of the Franchise or Office, nor any interest (as defined below) belonging to you or your Owners may be voluntarily, involuntarily, directly or indirectly, sold, leased, conveyed, given away, subfranchised, sublicensed, pledged, mortgaged, assigned, transferred, encumbered or otherwise disposed of by you or your Owners (including, without limitation, by will, inheritance, declaration of or transfer in trust or by operation of law) without our prior written approval. Any such assignment, transfer or encumbrance without such approval shall have no effect and shall constitute a breach of this Agreement. A transfer of ownership of the Franchise or Office (or its assets) may only be made in conjunction with a transfer of this Agreement. For purposes of this Section and any other Section of this Agreement, an "*Interest*" shall mean shares of your stock or securities convertible into shares of your stock (if you are a corporation); proprietorship, partnership, membership or other interest (if you are a proprietorship, partnership, limited liability company or other type of business entity); or any other equitable or legal right in or to any shares of such stock or in any such proprietorship, partnership, membership or other interest. Any unauthorized sale, lease, conveyance, gift, subfranchise, sublicense, pledge, mortgage, assignment, transfer or encumbrance by operation of law or otherwise, or any attempt to do so, shall be deemed void and grounds for us to terminate this Agreement.

C.  **CONDITIONS FOR TRANSFER OR ASSIGNMENT OF LESS THAN CONTROLLING INTEREST.**

If you, or if you are a Business Entity, your Owners, propose to transfer or assign any interest or interests totaling, in the aggregate, less than a controlling interest, we will not unreasonably withhold our consent to such transfer or assignment to persons who meet our qualifications for owners of RE/MAX offices, although we reserve the right to impose reasonable conditions as a prerequisite for receiving our approval. Such conditions may include some or all of the conditions set forth in Subsection 12.D. below, as we deem appropriate under the circumstances, except that we will not charge a transfer fee for any permitted assignment or transfer under this Subsection 12.C. "*Controlling interest*" shall be defined to be any interest greater than 50% ownership interest in a proprietorship, partnership or limited liability company or other type of business entity or, if a corporation, any interest greater than 50% of the equity and voting power of all issued and outstanding capital stock.

D.  **CONDITIONS FOR TRANSFER OR ASSIGNMENT OF AGREEMENT OR CONTROLLING INTEREST IN FRANCHISE OWNER.**

Provided we do not exercise our right of first refusal pursuant to Subsection 12.H., if you or your Owners, propose to transfer or assign this Agreement, the Franchise, the assets of the Franchise or Office or a controlling interest (as defined above), we will not unreasonably withhold our consent provided you or your Owners, as appropriate, submit to us in connection with the request for our consent such financial and other information we prescribe demonstrating that the transferee(s) or assignee(s) have sufficient business experience, aptitude, qualifications and financial resources in our judgment to operate the Office and that they otherwise meet our criteria for ownership of a RE/MAX franchise. Because we have historically placed great value on developing business relationships with, and have relied on the personal skills of, individual franchise owners, we have generally permitted transfers or assignments only to individuals or entities

closely owned or held by such individuals. In addition, our franchise agreements prohibit, and we have traditionally refused to permit, franchisees from engaging in competitive businesses. Moreover, we have historically declined transfers or assignments to competitors or entities controlled by or directly or indirectly affiliated with competitors or organizations in which conflicts of interest may arise, or for which their RE/MAX real estate office will not be their principal focus. Accordingly, it shall not be deemed unreasonable for us, and we expressly reserve the *unfettered right*, (i) to withhold our consent to proposed transfers or assignments to institutions (whether held publicly or privately) including, by way of example only, banking or other financial institutions, mutual fund companies and insurance companies, mortgage companies and title companies; and (ii) to withhold our consent to transfers or assignments to individuals or entities offering products or services that directly or indirectly compete with the products or services offered by RE/MAX offices, RE/MAX Regional or International, or that are designed to bolster other business activities as opposed to focusing primarily on the RE/MAX real estate brokerage business, including without limitation, real estate, mortgage, title, insurance, relocation or franchising services.

In addition, all of the following conditions must be met before or at the time of such assignment or transfer or as we may designate:

(1)     you and your Owners must be in compliance with the terms and conditions of this Agreement and any other franchise agreements you or your Owners may have with us;

(2)     you must submit to us for our review and prior approval all proposed transfer or assignment documents, including any purchase and sale agreements to be executed in connection with such transfer or assignment;

(3)     you must pay any amounts owed to us or International which are unpaid, including the entire unpaid balance of any promissory note with us or International and any interest due on such note;

(4)     the transferee(s) or assignee(s) must meet our then current subjective and objective standards for new franchisees, including, if then applicable, those relating to relevant experience, education and licensing, background and past record of compliance with laws, financial capacity, skills, integrity and other qualities of character. The transferee(s) or assignee(s) must also execute a form authorizing RE/MAX Regional to obtain a consumer report and to conduct a credit and background check;

(5)     the transferee(s) or assignee(s), if appropriate as determined by us, must agree to attend and complete the RE/MAX Management Training Course then being offered by International;

(6)     if your lease or sublease for the Premises requires it, the Lessor must have consented to the assignment of the lease or sublease of the Premises to the transferee(s) or assignee(s);

(7)     you must pay us a transfer fee equal to $2,500 and escrow with us any amounts deemed necessary by us to cover any additional costs we may incur in connection with such transfer or assignment;

(8)     you and your Owners must execute a transfer or assignment agreement and a full general release (in a form satisfactory to us) of any and all claims against us and our officers, directors, employees, affiliates and agents and against International and its officers, directors, employees, affiliates and agents;

(9)     the transferee(s) or assignee(s) must execute a new franchise agreement with us in the form we are then customarily using in the grant of franchises for RE/MAX offices (including any transfer addendum then being used by us), which agreement and any transfer addendum shall supersede this Agreement and may have different terms than this Agreement, including, without limitation, higher fees, advertising contributions and quotas. The new Franchise Agreement shall provide for a term coinciding with the remainder of the Term.

(10)     you must submit to us current, accurate financial statements and other documents of the proposed transferee(s) or assignee(s) sufficient to enable us to determine and to either approve or disapprove, in our sole discretion, the character, creditworthiness, business experience, professional credentials and ethical background of the proposed transferee(s) or assignee(s); and

(11)   the transferee(s) or assignee(s) must execute and deliver to us a transfer agreement, personal guaranty and such other documents as we may require or deem important or desirable to the preservation and protection of our rights.

You agree that it shall not be unreasonable for RE/MAX Regional to refuse to consent to an assignment or transfer on the basis that one or more of the above conditions have not been met.

Any addendum, amendment or other modification to this Agreement that grants to you any type or kind of territorial rights is not transferable or assignable and will not become a part of the franchise relationship between RE/MAX Regional and the transferee(s) or assignee(s).

### E.   DEATH OR DISABILITY.

Upon the death or permanent disability of you or an Owner, the executor, administrator, conservator or other personal representative of such person must transfer his/her interest in this Agreement and the Franchise within a reasonable time, not to exceed six months from the date of death or permanent disability, to a person we have approved. Such transfers, including, without limitation, transfers by a will or by inheritance, will be subject to all the terms and conditions for assignments and transfers contained in this Agreement, including but not limited to our right of first refusal as set forth below in Subsection 12.H. During that six-month period, the Office must be under the primary supervision of a manager who has a valid state real estate broker license and otherwise meets our management qualifications. Failure to appoint such a manager or to dispose of such interest within that six-month period of time will constitute grounds for termination under this Agreement.

### F.   TRANSFER TO A BUSINESS ENTITY.

If you are in full compliance with this Agreement, we will not unreasonably withhold our approval of a proposed assignment or transfer of this Agreement to a Business Entity provided you, or if there is more than one of you, all of you together, maintain and own a controlling interest (as defined above) in the Business Entity and, if you have not already done so, you execute a Guaranty and Assumption of Obligations, in the form prescribed by us, in which you personally guarantee and agree to be bound by, and responsible for the performance of, all of the terms, conditions, covenants and obligations under this Agreement. In addition, we reserve the right to impose reasonable conditions as a prerequisite for receiving our approval to any proposed assignment or transfer to a Business Entity. Such conditions may include some or all of the conditions set forth in Subsection 12.D. above, as we deem appropriate under the circumstances, except that we will not charge a transfer fee for any permitted assignment or transfer under this Subsection 12.F. that occurs within one year of the Agreement Date. In the case of assignment or transfer of this Agreement to a Business Entity, the Business Entity shall conduct no business other than the business of the Office and must be managed by one of the principal owners of the Business Entity or a manager as defined in Subsection 8.F. All Business Entities must comply fully with Subsection 8.E. of this Agreement. The articles of incorporation, by-laws, articles of partnership, partnership agreement and other organizational documents of the Business Entity shall recite that the issuance and transfer of any interest therein is restricted by the terms of this Section 12 and all issued and outstanding stock certificates of any corporation shall bear a legend reflecting or referring to the restrictions of this Section 12. Transfers of shares or of partnership, membership or other interests will be subject to the provisions of this Section 12.

### G.   EFFECT OF APPROVAL OF TRANSFER OR ASSIGNMENT.

Our consent to a transfer or assignment of any interest subject to the restrictions of this Section 12 shall not constitute a waiver of any claims we may have against the transferor or assignor under this Agreement, nor shall it be deemed a waiver of our right to demand exact compliance with any of the terms or conditions of the new franchise agreement by the assignee(s) or transferee(s).

### H.   RIGHT OF FIRST REFUSAL.

Except as otherwise provided in Section 12, your right, and/or any of your Owners' rights, to transfer or assign this Agreement, the Franchise, the assets of the Franchise or Office or a controlling interest (as defined above), shall be subject to our right of first refusal which shall be exercised in the following manner:

(1)     You and/or your Owners must provide us with a written notice setting forth (i) all of the terms and conditions of any *bona fide* offer relating to a proposed transfer or assignment (the purchase price and terms must reflect the bona fide price offered and not a value for any other property or rights), and (ii) all available information concerning the proposed transferee(s) or assignee(s).

(2)     Within thirty (30) business days of our receipt of such notice and all accompanying information reasonably necessary to evaluate the offer (or if we request additional information, within thirty (30) days after receipt of such additional information), we shall notify you and/or your Owners of one of the following:

a.     We will exercise our right of first refusal as provided herein; or

b.     We grant our consent to such transfer or assignment to the proposed transferee or assignee as stated in the notice; or

c.     We do not exercise our right of first refusal and do not consent to a transfer or assignment to the proposed transferee or assignee.

(3)     If we elect to exercise our right of first refusal: a) we, or our designee, shall purchase the interests and/or assets proposed to be transferred or assigned on the same terms and conditions as set forth in the bona fide offer; provided, however, that we or our designee may substitute cash for any form of payment proposed in such offer and that we or our designee may deduct from the purchase price any unpaid fees due to RE/MAX Regional or International; b) our or that of our designee's credit shall be equal to the credit of any proposed purchaser, and we or our designee shall have not less than ninety (90) days from the date we exercised our right of first refusal to consummate the transaction; and c) we or our designee shall have the right to acquire from you and/or your Owners, for nominal consideration, an assignment of all of your rights, or your Owners' rights, under any lease or sublease covering the Premises.

(4)     If we do not elect to exercise our right of first refusal and consent to the transfer or assignment, the proposed transferor or assignor shall, for a period of ninety (90) days, be free to transfer or assign to such proposed transferee(s) or assignee(s) upon the terms and conditions specified in the notice, subject to the requirements set forth in Subsection 12.D. If, however, the terms shall be materially changed, or if the ninety (90) day period expires, we shall again have the right of first refusal and the proposed transferor or assignor shall again be required to comply with this Subsection 12.H.

(5)     Our right of first refusal shall in no way modify or diminish our right to withhold our consent to a transfer or assignment as set forth under Subsection 12.B.

13.     **TERMINATION OF THE FRANCHISE.**

A.     **TERMINATION BY RE/MAX REGIONAL WITH CAUSE.**

You will be deemed to be in material default of an essential condition of this Agreement in the event of the occurrence of any of the specific defaults listed in Subsections 13.B., 13.C., and 13.D. below. You acknowledge and agree that the occurrence of any such material default will constitute just and good cause for termination of your rights under this Agreement, or any other franchise agreement between you or your Owners and RE/MAX Regional and any of its affiliates, and that our right to terminate this Agreement based on any such material default is reasonable.

B.     **IMMEDIATE TERMINATION.**

You will be in material default of an essential condition of this Agreement and we have the right to terminate this Agreement effective upon delivery of notice of termination to you and without providing an opportunity to cure, if:

(1)     you and RE/MAX Regional, acting reasonably and in good faith, have not agreed on a location for the Office within 90 days of the Agreement Date;

(2)     you fail to open the Office and begin business operations in compliance with the terms and provisions of this Agreement within 180 days of the Agreement Date;

(3)     you or your Owner responsible for the Office fails to attend the first RE/MAX Management Training Course conducted for new franchisees by International after the Agreement Date;

(4)     you abandon, surrender, transfer control of, lose the right to occupy the Premises or do not actively operate the Office for a period of five consecutive days unless caused by fire, flood, earthquake or similar causes beyond your reasonable control;

(5)     you or your Owners sell, lease, convey, give away, subfranchise, sublicense, pledge, mortgage, assign, transfer, encumber or otherwise dispose of any direct or indirect interest in this Agreement, the Franchise, the assets of the Franchise or Office or any interest in violation of the provisions of Section 12 of this Agreement;

(6)     you are adjudged a bankrupt, become insolvent or make a general assignment for the benefit of creditors or if a voluntary or involuntary petition in bankruptcy is filed by or against you or if a receiver or trustee is appointed or takes possession of the Office, the assets of the Office or the Franchise, unless such petition, appointment or taking is set aside, withdrawn or ceases to be in effect within twenty (20) days of the date of any such event;

(7)     your or any of your Owners' real estate license is suspended or revoked by the governing real estate commission; or you or any of your Owners or any of your or your Owners' immediate family members, Sales Associates or other persons affiliated with or represented as being affiliated with your Office materially violate laws applicable to real estate brokerage and related activities or are convicted of or plead no contest to any crime or offense or engage in other conduct or activity that adversely affects or is likely to adversely affect the reputation or image of the Office, other RE/MAX offices or RE/MAX Affiliates, us or International or the goodwill associated with the RE/MAX Marks or the System; or you or any of your Owners engage in any other conduct or activity that is unprofessional, unethical, dishonest or disruptive to the effective operation of the Office;

(8)     you or any of your Owners fail on three or more separate occasions within any 12 consecutive month period to comply with this Agreement or any standard, procedure, policy or guideline prescribed by us or International, whether or not such failures to comply are corrected after notice is given to you;

(9)     you fail to report to us all Sales Associates affiliated with the Office or any Satellite Office for any month;

(10)    you fail to comply with any federal, state or local law applicable to the operation of the Franchise within ten (10) days after notification of noncompliance from any applicable agency;

(11)    you or any of your Owners, or anyone affiliated with your Office, is determined pursuant to Executive Order 13224 to have committed acts of Terrorism or poses a significant risk of committing acts of Terrorism, or assists, sponsors or supports Terrorists or acts of Terrorism (as defined in Subsections 8.O.(2) and (3), or otherwise violates any provision of Subsection 8.O.);

(12)    you or your Owners make any misrepresentation to us, or omit any material information—including but not limited to information bearing on your or your Owners' integrity or other qualities of character—in your application for the rights granted by this Agreement or in the financial information provided by you and your Owners; or

(13)    you or your Owners fail to comply with any requirement, obligation, term or condition of any other franchise or other agreement between you or your Owners and us or any of our affiliates, and do not cure such default in accordance with the terms of such other agreement.

C.    **TEN (10) DAYS NOTICE.**

We have the right to terminate this Agreement effective ten (10) days after providing written notice to you if:

(1)    you or your Owners do not pay when due any monies owed to us, International or the Broker/Owner Council; or

(2)    you or your Owners default under the terms of any promissory note executed in favor of us or International.

This notice will advise you, and you hereby understand and agree, that if the default is not cured within ten (10) days, this Agreement automatically terminates at the end of such 10 days without further notice from us.

D.    **THIRTY (30) DAYS NOTICE.**

We have the right to terminate this Agreement effective thirty (30) days after providing written notice to you if:

(1)    you or your Owners fail to satisfy and maintain your Quota as provided in Section 7 of this Agreement; or

(2)    you or your Owners fail to comply with any other provision of this Agreement or any standard, procedure, policy or guideline prescribed by us or International.

This notice will advise you, and you hereby understand and agree, that if the default is not cured within thirty (30) days, this Agreement automatically terminates at the end of such thirty (30) days without further notice from us.

14.    **RIGHTS AND OBLIGATIONS OF RE/MAX REGIONAL AND FRANCHISE OWNER UPON TERMINATION OR EXPIRATION OF THE FRANCHISE.**

A.    **PAYMENT OF AMOUNTS OWED TO RE/MAX REGIONAL AND INTERNATIONAL.**

You agree to pay us and International within five days after the effective date of termination or expiration of the Franchise, or at any later date that the amounts due to us are determined, such continuing franchise fees, advertising contributions, and all other amounts owed to us and International which are then unpaid.

B.    **DE-IDENTIFICATION.**

You and your Owners agree that after the termination or expiration of the Franchise you and your Owners will:

(1)    immediately and clearly distinguish your operations from RE/MAX and the System, so as to avoid any possibility of confusion to the public, and not directly or indirectly at any time identify any business with which you are associated as being a current or former RE/MAX office or franchisee or otherwise use the System or hold yourself out to the public in any way as being or as having been affiliated with us, International or other RE/MAX Affiliates;

(2)    immediately erase or obliterate from your letterhead, stationery, printed matter, advertising or other materials the RE/MAX Marks and all words and designations indicating that you are or were associated or affiliated with us, International or other RE/MAX Affiliates;

(3)    immediately return to us the Operations Materials, Confidential Information and all other manuals, printed materials, forms, rosters or other materials (and all copies of any such items) obtained from us or International;

(4)     immediately take any action that may be required to cancel all trade, fictitious or assumed names or equivalent registrations which contain any reference to any RE/MAX Mark;

(5)     immediately notify your state real estate commission, your local board of REALTORS®, the National Association of REALTORS®, and your clients that your Office is no longer in existence and, unless you have affiliated with another RE/MAX office, that you are no longer affiliated with the RE/MAX organization;

(6)     promptly assign all of the telephone numbers listed for the Office to us, or our designee, with no forwarding message or other information that would steer callers from RE/MAX Regional or its designee, and immediately confirm to the telephone company in writing to redirect the phone numbers used by the Office to RE/MAX Regional or its designee, and to modify or discontinue at next printing any and all yellow pages advertising or listings for the Office and to exercise such other authority as you have given in accordance with Subsection 4.B. You acknowledge and agree that by executing this Agreement, you grant us a power of attorney that enables us to take any and all actions required to effectuate the provisions of Subsection 4.B. and this Subsection 14.B.(6);

(7)     immediately take all action that may be required to ensure that any Domain Name you have registered that includes the mark "RE/MAX," or any of the other RE/MAX Marks, is deactivated and deleted from the Domain Name registrar's records, or at RE/MAX Regional's or International's direction, assign such Domain Name(s) to either RE/MAX Regional, International or their designees or take such other actions regarding such Domain Name(s) as RE/MAX Regional or International may direct; remove all RE/MAX Marks that you may use as meta-tags from your web sites; take any and all action required to remove any Internet hyperlinks that exist that include any of the RE/MAX Marks, and take any and all other action as we or International may direct in regard to cessation of the use of any of the RE/MAX Marks on the Internet;

(8)     refrain from adopting or using in any manner, or for any purpose, the RE/MAX Marks, including without limitation: i) the RE/MAX red-over-white-over-blue trade dress or any other trade dress that on review is deemed by International to be confusingly similar to the RE/MAX trade dress; or ii) the terms "RE/MAX," "REMAX" or "MAX" or any other term that begins with the prefix "RE" or ends in the suffix "MAX" or any other term that on review is deemed by International to be likely to create confusion or question regarding you or your Owners' affiliation with or sponsorship or endorsement by the RE/MAX organization. You and your Owners further agree to refrain from the use of any "for sale" sign, trade dress or identity scheme comprised of lateral elements in red and blue separated by a white element and from the use of a design comprised of a three horizontal bar design, from the use of a hot air balloon or a hot air balloon symbol, and from use of the term "Above the Crowd" or any other phrase beginning with "Above" or ending with "Crowd";

(9)     refrain from referring to designations, certifications, awards or recognition that we, International or any of our related or affiliated companies may have granted to you or your Owners at any time during your affiliation with the RE/MAX network in post cards or other materials or in any form of advertising or promotion; and

(10)    at all times for a period of three years following termination or expiration keep us advised of the current business and residential address(es) and telephone number(s) of you and your Owners, as well as the business address and telephone number of all such persons' employers, if any.

C.     **PREMISES**.

If you retain possession of the Premises, you agree to completely remove or modify, at your sole expense, any part of the interior and exterior decor that we deem necessary to disassociate the Premises from the appearance of a RE/MAX office, including without limitation any signage bearing the RE/MAX Marks. If you do not take the actions we request within 10 days after notice from us, you agree that we have the right to enter the Premises and make the required changes at your expense, and you agree to reimburse us for those expenses on demand.

D.       **CONFIDENTIAL INFORMATION.**

You and your Owners agree that on termination or expiration of the Franchise you will *immediately cease to use,* but maintain the confidentiality over, any of the Confidential Information, procedures, techniques and materials acquired from us or International and agree not to use, sell, convey, display or share, in whole or in part, any of such items for any purpose. You further agree to return all such items to us or destroy them in a secure manner.

E.       **CONTINUING OBLIGATIONS.**

All obligations of this Agreement (*whether yours or ours*) which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect after and notwithstanding its expiration or termination until such obligations are satisfied in full or by their nature expire.

F.       **MONETARY OBLIGATIONS NOT RELEASED.**

Termination of this Agreement shall not terminate any monetary obligation that you may owe to us or International or to any other person or entity as may be required by this Agreement, and shall not entitle you to any refund of any monies previously paid pursuant to the terms of this Agreement.

G.       **TERMINATION NOT EXCLUSIVE REMEDY.**

Termination of this Agreement by us shall not be an exclusive remedy and shall not in any way affect our rights, or the rights of International, to receive or collect fees, dues or other amounts payable by you under this Agreement, to enforce the provisions of this Agreement against you or to sue for damages or to pursue any other legal or equitable remedy for a breach of this Agreement by you.

H.       **RIGHT TO MEET WITH SALES ASSOCIATES.**

In order to facilitate an orderly and efficient transition and to preserve the goodwill associated with the RE/MAX name and RE/MAX Marks in the event of termination or expiration of this Agreement, you agree that we shall have the right to contact and communicate personally with any or all of your Sales Associates 180 days prior to expiration of this Agreement if you elect not to renew (either by notifying us of your intent not to renew or by failing to timely provide us with notice of your intentions regarding renewal) or, in the case of termination, immediately after notice of termination has been delivered to you (including during any period of time you may have to cure defaults) to solicit and/or discuss with them their options for continued affiliation with other RE/MAX offices.

I.       **DAMAGES.**

Notwithstanding anything contained herein, in addition to any other remedies provided for herein or under applicable law, you and your Owners jointly and severally agree that the sum of $500 shall be paid to us for each day following the date of required timely performance under Subsections 14.B.(1), (2), (3), (4), (5), (6), (7), (8) and 14.C. and 14.D. hereof during which you fail to timely perform your obligations after passage of a 10-day period following the termination or expiration of this Agreement, which monetary amount shall be regarded as liquidated damages and not as a penalty. This section does *not* limit or affect in any way you or your Owners' liability for trademark infringement, unfair competition or breach of contract nor affect or limit the right of RE/MAX Regional or International to seek or obtain injunctive relief or specific performance.

15.   **DISPUTE RESOLUTION.**

A.       **DISPUTE RESOLUTION.**

The RE/MAX Dispute Resolution System (the "*RDRS*") is a set of rules and procedures for the resolution of disputes, complaints, claims or other problems ("*Disputes*") that arise between you and RE/MAX Regional, International or other affiliates of the RE/MAX network of offices and real estate agents. The RDRS is contained within the Operations Materials. The RDRS may not be offered or available in some regions or for some Disputes.

B.   **DISPUTES BETWEEN RE/MAX REGIONAL AND FRANCHISE OWNER.**

Except as provided below, if any Dispute regarding this Agreement or the rights and responsibilities of the parties under this Agreement should arise between you and us, the parties agree to submit the dispute to mediation and, if unsuccessful, to binding arbitration using the RDRS, if it is available.

C.   **DISPUTES INVOLVING RE/MAX FRANCHISEES, SALES ASSOCIATES OR OTHER RE/MAX AFFILIATES.**

In the event of a Dispute involving you and International, any other RE/MAX franchisee, any RE/MAX Sales Associate (whether affiliated with your Office or any other RE/MAX office) or other RE/MAX Affiliate, you agree to submit the Dispute to mediation and, if unsuccessful, to binding arbitration using the RDRS, if it is available.

D.   **ALTERNATIVES.**

RE/MAX Regional reserves the unfettered right to determine whether or not a dispute is appropriate for resolution under the RDRS, and reserves the unfettered right to decline the administration of any dispute it determines is not appropriate for resolution under the RDRS and/or that it determines would be more appropriately administered by an alternative mediation and arbitration system. Accordingly, you understand and acknowledge that the RDRS may not be available, either generally or for a specific dispute. If the RDRS is not offered or otherwise available, the Dispute shall be submitted to an alternative mediation and arbitration system mutually acceptable to the parties to the Dispute. If the parties cannot agree on an alternative mediation and arbitration system, then the Dispute shall be submitted to the American Arbitration Association for mediation and, if unsuccessful, for binding arbitration in accordance with its Commercial Mediation Rules or Commercial Arbitration Rules, as appropriate.

E.   **LOCALE.**

Binding arbitration under Subsection 15.B. above shall take place at such location as the parties may mutually agree to in writing, and if the parties cannot agree, then in Denver, Colorado. Binding arbitration under Subsection 15.C. above shall take place in the county where all parties reside or at such other location as the parties may mutually agree to in writing. If the parties reside in different counties and cannot agree on a location, then the location of such binding arbitration shall be determined by a court of competent jurisdiction as part of a motion to compel arbitration.

F.   **PROCEDURE.**

The agreement to arbitrate under Subsections 15.B. and 15.C. above shall be enforceable through a *petition to compel arbitration* filed with a court having jurisdiction over such matter. The award of the arbitrators shall include reasonable costs to the prevailing party, and such award shall be binding upon all parties, and may be entered as a judgment in a court of competent jurisdiction.

If any other party to a Dispute refuses to arbitrate and is not bound by agreement to do so or cannot be compelled to do so on other grounds, you will be deemed released from the obligation to mediate and/or arbitrate under this Agreement for that Dispute as to that party.

It is agreed that any legal action relating to this agreement to arbitrate, including but not limited to any action brought to compel arbitration, to determine the location of such arbitration, or to reduce an award of the arbitrators to a judgment or to set aside an award, shall be deemed to be an action brought in connection with rights and obligations arising out of this Agreement and, as such, shall be subject to and governed by the provisions of Subsection 16.J.

G.   **EXCEPTIONS TO MEDIATION AND ARBITRATION.**

Notwithstanding the obligation to arbitrate or mediate as set forth in this Section, neither we nor International shall be required to arbitrate or mediate claims relating to monies owed to either us or International; claims relating to the RE/MAX Marks or the trade names, copyrights, trade secrets or Confidential Information belonging to us or International; claims relating to an assignment or transfer by franchisee in violation of Section 12; claims involving any

dispute in which we are entitled to terminate this Agreement without prior notice; or claims relating to the post-termination obligations set forth in Section 14 of this Agreement. In addition, the obligation to mediate or arbitrate as set forth herein shall not preclude either party from seeking temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain interim relief when deemed necessary to preserve the status quo or prevent irreparable harm or injury pending resolution by mediation or arbitration of the actual Dispute between the parties.

16.   **CONSTRUCTION OF AGREEMENT AND ENFORCEMENT**.

   A.   **INVALID PROVISIONS; SUBSTITUTION OF VALID PROVISIONS**.

   If any law or court order requires a greater advance notice of the termination or non-renewal of this Agreement than is required under this Agreement, or the taking of some other action which is not required by this Agreement, the notice and/or other action required by law or such order shall apply. If any portion or provision of this Agreement or any specification, standard, operating procedure, policy or guideline we prescribe is inconsistent with, or rendered invalid or unenforceable by, any law or court order, the inconsistent, invalid or unenforceable portion or provision shall be modified so as to be valid and enforceable. If such portion or provision of this Agreement cannot be saved, it shall be stricken and its deletion shall not affect the validity or enforceability of the other portions or provisions of this Agreement or such specification, standard, operating procedure, policy or guideline.

   B.   **UNILATERAL WAIVER OF OBLIGATIONS**.

   Either of us may, by written notice, unilaterally waive or reduce any obligation or restriction of the other party under this Agreement. The waiver or reduction may be revoked at any time for any reason on 10 days' written notice.

   C.   **CONSENTS**.

   Whenever this Agreement requires our advance approval or consent, you agree to make a timely written request for it. Our approval or consent will not be valid unless it is in writing. Except where this Agreement expressly obligates us to reasonably approve or not unreasonably withhold our approval of any of your actions or requests, we have the absolute right to refuse any request by you or to withhold our approval of any action or omission by you.

   Whenever we or International have reserved in this Agreement a right to take or withhold an action, or to grant or decline to grant you a right to take or omit an action, except as otherwise expressly and specifically provided in this Agreement, we and International may make decisions or exercise rights on the basis of the information readily available to us, and our judgment of what is in our best interests and/or in the best interests of our franchise network, at the time our decision is made, shall be deemed to be reasonable and enforceable, without regard to whether other reasonable or even arguably preferable alternative decisions could have been made by us and without regard to whether our decision or the action we take promotes our financial or other individual interest.

   D.   **NO GUARANTEES**.

   If in connection with this Agreement we provide to you any waiver, approval, consent, or suggestion, or if we neglect or delay our response or deny any request for any of those, we will not be deemed to have made any warranties or guarantees which you may rely on, and will not assume any liability or obligation to you.

   E.   **NO WAIVER**.

   If at any time we do not exercise a right or power available to us under this Agreement or do not insist on your strict compliance with the terms of the Agreement, or if there develops a custom or practice which is at variance with the terms of this Agreement, we will not be deemed to have waived our right to demand exact compliance with any of the terms of this Agreement at a later time. Similarly, our waiver of any particular breach or series of breaches under this Agreement or under any other agreement between us and any franchisee will not affect our rights with respect to any later breach. It will also not be deemed to be a waiver of any breach of this Agreement for us to accept payments which are due to us under this Agreement.

F.  **CUMULATIVE REMEDIES.**

The rights and remedies specifically granted to either you or us by this Agreement will not be deemed to prohibit either of us from exercising any other right or remedy provided under this Agreement or permitted by law or equity.

G.  **SPECIFIC PERFORMANCE; INJUNCTIVE RELIEF.**

We will be entitled, without being required to post a bond, and even if this Agreement has been terminated or has expired, to the entry of temporary and permanent injunctions and orders of specific performance (1) to enforce the provisions of this Agreement relating to your use of the RE/MAX Marks and your non-disclosure and non-competition obligations under this Agreement, (2) to prohibit any act or omission by you or your agents or employees that constitutes a violation of any applicable law, ordinance or regulation, constitutes a danger to the public, or may impair the goodwill associated with the RE/MAX Marks, the System, us, other RE/MAX Affiliates or International, or (3) to prevent any other irreparable harm to our interests.

H.  **COSTS AND LEGAL FEES.**

If we engage legal counsel in connection with any failure by you or your Owners to comply with this Agreement, you shall reimburse us and/or International, upon demand, for the costs and expenses incurred by us and/or International as a result of such failure and our enforcement of the terms of this Agreement, including, without limitation, reasonable accountants', attorneys', attorneys' assistants', arbitrators' and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred prior to, in preparation for, in contemplation of or in connection with the filing of any judicial or arbitration proceeding to enforce this Agreement. You and your Owners shall be responsible for your own such costs and expenses. This provision shall survive termination of this Agreement.

I.  **WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL.**

THE PARTIES HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM EACH WILL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY IT. THE PARTIES IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM.

J.  **GOVERNING LAW/CONSENT TO JURISDICTION.**

EXCEPT TO THE EXTENT GOVERNED BY THE UNITED STATES TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. §§1051 ET SEQ.), THIS AGREEMENT AND THE FRANCHISE WILL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF COLORADO (WITHOUT REFERENCE TO ITS CHOICE OF LAW AND CONFLICT OF LAW RULES). YOU AGREE THAT ANY ACTION ARISING OUT OF OR RELATING IN ANY MANNER TO THIS AGREEMENT (WHICH IS NOT REQUIRED TO BE ARBITRATED HEREUNDER OR AS TO WHICH ARBITRATION IS WAIVED) SHALL BE INSTITUTED IN, AND ONLY IN, A STATE OR FEDERAL COURT OF GENERAL JURISDICTION IN THE COUNTY OF DENVER, STATE OF COLORADO AND YOU IRREVOCABLY SUBMIT TO THE JURISDICTION OF SUCH COURTS AND WAIVE ANY OBJECTION YOU MAY HAVE TO EITHER THE EXCLUSIVE JURISDICTION OR VENUE OF SUCH COURT.

K.  **BINDING EFFECT.**

This Agreement is binding on and will inure to the benefit of our successors and assigns and will be binding on and inure to the benefit of your successors and assigns, and if you are an individual, on and to your heirs, executors and administrators.

L.   **MODIFICATION OF FRANCHISE AGREEMENT.**

This Agreement may not be modified, amended or altered except by an instrument signed by all of the parties to this Agreement. Notwithstanding the preceding sentence, you understand and agree that we or International may, from time-to-time, to preserve and enhance the reputation of the RE/MAX organization, issue new (or amend or modify existing) standards, operating procedures, policies and guidelines pertaining to the System. In addition, the parties agree that they will execute any amendments or modifications to this Agreement as may from time-to-time be required as a result of changes in governing law.

M.   **NO LIABILITY TO OTHERS; NO OTHER BENEFICIARIES.**

We will not, because of this Agreement or by virtue of any approvals, advice or services provided to you, be liable to any person or legal entity who is not a party to this Agreement. You understand that you are not a third party beneficiary of any other franchise agreement between us and other RE/MAX franchisees and that you have no independent right to enforce the terms of, or require performance under, any other franchise agreement.

N.   **CONSTRUCTION.**

All headings of the various Sections and Subsections of this Agreement are for convenience only and do not affect the meaning or construction of any provision. All references in this Agreement to masculine, neuter or singular usage will be construed to include the masculine, feminine, neuter or plural, wherever applicable.

O.   **JOINT AND SEVERAL LIABILITY.**

If two or more persons are the Franchise Owner under this Agreement, their obligation and liability to us shall be joint and several.

P.   **MULTIPLE ORIGINALS.**

This Agreement may be executed using multiple copies, each of which will be deemed an original.

Q.   **TIMING IS IMPORTANT.**

Time is of the essence of this Agreement. ("*Time is of the essence*" is a legal term that emphasizes the strictness of time limits. In this case, it means it will be a material breach of this Agreement to fail to perform any obligation within the time required or permitted by this Agreement.)

R.   **INDEPENDENT PROVISIONS.**

The provisions of this Agreement are deemed to be severable. In other words, the parties agree that each provision of this Agreement will be construed as independent of any other provision of this Agreement.

S.   **FRANCHISE OWNER MAY NOT WITHHOLD PAYMENT.**

You agree to pay all amounts due under this Agreement without deduction, set-off or abatement. You further agree that you will not, on alleged grounds of non-performance by us of any of our obligations under this Agreement, withhold payment of any fees or other amounts due to us, International or any of our affiliates.

T.   **RELEASE OF PRIOR CLAIMS.**

By executing this Agreement, you and your Owners individually and on behalf of your heirs, legal representatives, successors and assigns, and each assignee of this Agreement by accepting such assignment, release and discharge us and International and each of our present and former officers, directors, employees, agents, servants, subsidiaries and affiliated corporations, partnerships or other entities, from any and all claims existing as of the date of this Agreement, and which relate to or arise out of any franchise agreement or any other agreement between the parties executed prior to the date of this Agreement, or the franchise relationship previously existing between the parties,

including but not limited to, any and all claims, whether presently known or unknown, suspected or unsuspected, arising under the franchise, securities, antitrust laws or other laws of the United States or of any state.

**U.     ACTIONS BARRED.**

Except for certain claims and actions as set forth below, any and all claims and actions arising out of or relating to this Agreement (including, but not limited to, the offer and sale of the franchise covered by this Agreement), the relationship between us or your operation of the Franchise, brought by any party to this Agreement against the other shall be commenced within one year from the occurrence of the acts or omissions giving rise to such claim or action, or such claim or action shall be barred. The foregoing one year limitation period will not apply to claims or actions by International or us for monies due under this Agreement, claims or actions relating to the RE/MAX Marks, or the trade names, copyrights, trade secrets or Confidential Information belonging to us or International or claims or actions relating to the post-termination obligations set forth in Section 14 of this Agreement.

**V.     AUTHORIZATION TO COMMUNICATE ELECTRONICALLY/ PROMPT RESPONSE REQUIRED.**

By executing this Agreement, you authorize RE/MAX Regional and International, as well as any of their affiliates and approved suppliers, to communicate with you electronically, including via electronic mail and facsimile and, unless a written communication is required, to communicate with you via telephone, notwithstanding whether any or all of your Office telephone numbers appear on a federal or state Do-Not-Call registry. You understand and acknowledge that it is critical to the efficient and successful administration of the franchise relationship that you *promptly respond to all communications from us.* Accordingly, you agree to respond within five business days to each communication from us.

**W.     NOTICES AND PAYMENTS.**

All written notices and reports permitted or required to be delivered by the provisions of this Agreement shall be deemed delivered at the time delivered by hand to the recipient party; one business day after transmission by facsimile, or other reasonably reliable *electronic communication system;* one business day after being placed in the hands of a commercial courier service for overnight delivery, or three business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified in writing. All payments and reports required by this Agreement shall be sent to us or International at the address to which you are notified from time-to-time, or to such other persons and places as we may direct from time-to-time.

**X.     CANCELLATION OF PRIOR UNDERSTANDINGS/ENTIRE AGREEMENT.**

This Agreement expresses fully the understanding by and between the parties, and all prior and contemporaneous understandings, agreements, commitments, conditions, warranties and representations of any kind, oral or written, as to the Franchise (except as to information and representations submitted by you to us in application to purchase the Franchise, including, but not limited to, financial statements, references, etc. which shall be deemed to be a part of this Agreement) are canceled and null, void and of no effect. Any previous matter, presently covered within this Agreement, is hereby superseded and canceled with no further liabilities or obligations of the parties with respect to such matter, except as to any monies due and unpaid between *the parties to this Agreement* at the time of execution of this Agreement.

**Y.     FORCE MAJEURE.**

Neither party shall be deemed to be in breach of this Agreement if a party's failure to perform its obligations results from acts of god, fires, strikes, war, terrorism, riot, governmental laws or regulations, or any other similar event or cause. Any delay resulting from any of these causes will extend performance accordingly or excuse performance in whole or in part as may be reasonable, except that none of these causes shall excuse payments of amounts owed at the time of such occurrence.

Z.   **DELEGATION OF RE/MAX REGIONAL'S DUTIES UNDER THIS AGREEMENT**.

Notwithstanding any understanding to the contrary, it is acknowledged and agreed that (i) RE/MAX Regional may delegate to International (or any other affiliate or third party), any or all of its rights and obligations arising under this Agreement, and (ii) any party to which such rights and obligations of RE/MAX Regional have been delegated will be entitled to directly and/or indirectly receive such benefits which would otherwise inure to the benefit of RE/MAX Regional under the terms of this Agreement.

AA.   **PARAGRAPH HEADINGS**.

Paragraph headings used in this Agreement are for convenience only and shall not be deemed to affect the meaning or construction of any of the terms, provisions, covenants or conditions of this Agreement.

17.   **ACKNOWLEDGMENTS**.

You expressly acknowledge and accept the following:

(1)   YOU RECEIVED FROM US A RE/MAX FRANCHISE OFFERING CIRCULAR AS REQUIRED BY LAW AT THE EARLIER OF (A) OUR FIRST PERSONAL MEETING, OR (B) 10 BUSINESS DAYS PRIOR TO (i) THE EXECUTION OF THIS AGREEMENT; OR (ii) THE PAYMENT OF ANY CONSIDERATION TO US.  YOU ALSO RECEIVED THIS AGREEMENT WITH ALL BLANKS COMPLETED AT LEAST FIVE BUSINESS DAYS PRIOR TO EXECUTION OF THIS AGREEMENT;

(2)   YOUR SUCCESS IN OWNING AND OPERATING A RE/MAX REAL ESTATE SERVICES BUSINESS IS SPECULATIVE AND WILL DEPEND ON MANY FACTORS INCLUDING, TO A LARGE EXTENT, YOUR INDEPENDENT BUSINESS ABILITY AND PERSONAL EFFORTS. YOU FURTHER AGREE THAT YOU, ONE OF YOUR PRINCIPAL OWNERS, OR SUCH VALIDLY LICENSED REAL ESTATE BROKER AS YOU SELECT TO MANAGE THE OFFICE, WILL BE RESPONSIBLE FOR, AND INTENDS TO DEVOTE BEST EFFORTS AND FULL TIME TO, THE MANAGEMENT AND DEVELOPMENT OF THE OFFICE;

(3)   NEITHER WE NOR INTERNATIONAL HAVE GUARANTEED ANY RESULTS TO YOU AND CANNOT, EXCEPT UNDER AND TO THE EXTENT OF THE TERMS OF THIS AGREEMENT, EXERCISE CONTROL OVER YOUR BUSINESS;

(4)   YOU DID NOT RECEIVE ORAL OR WRITTEN INFORMATION CONTRARY TO THE INFORMATION CONTAINED IN ANY FRANCHISE OFFERING CIRCULAR AND FRANCHISE AGREEMENT;

(5)   YOU DID NOT RECEIVE ORAL OR WRITTEN EARNINGS CLAIMS INFORMATION AND HAVE NOT RELIED ON ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT;

(6)   WE HAVE ENCOURAGED YOU TO SEEK LEGAL AND/OR OTHER PROFESSIONAL GUIDANCE AND ADVICE PRIOR TO SIGNING THE FRANCHISE AGREEMENT AND HAVE ENCOURAGED YOU TO CONTACT EXISTING RE/MAX FRANCHISEES TO GAIN A BETTER UNDERSTANDING OF THE REQUIREMENTS AND BENEFITS OF OWNING A RE/MAX OFFICE FRANCHISE;

(7)   YOU HAVE HAD A FULL OPPORTUNITY TO REVIEW THE OFFERING CIRCULAR AND FRANCHISE AGREEMENT PROVIDED BY US AND UNDERSTAND THE TERMS, CONDITIONS AND OBLIGATIONS OF THE FRANCHISE AGREEMENT;

(8)   NO REPRESENTATIONS OR PROMISES HAVE BEEN MADE BY US OR INTERNATIONAL TO INDUCE YOU TO ENTER INTO THIS AGREEMENT EXCEPT AS SPECIFICALLY INCLUDED IN THIS AGREEMENT;

(9)   YOU HAVE NOT RELIED ON ANY STATEMENTS ABOUT US, INTERNATIONAL OR THE FRANCHISE OTHER THAN THOSE CONTAINED IN THE OFFERING CIRCULAR IN MAKING YOUR DECISION TO SIGN THIS AGREEMENT; AND

(10)  YOU HAVE DEALT IN MANY VARIED BUSINESS TRANSACTIONS IN THE PAST WHICH HAVE BEEN OF GREATER COMPLEXITY THAN THIS TRANSACTION, AND THAT YOU ARE NOT PURCHASING A RE/MAX FRANCHISE FOR SPECULATIVE PURPOSES.

18.   **SUBMISSION OF AGREEMENT**.

THE SUBMISSION OF THIS AGREEMENT TO YOU DOES NOT CONSTITUTE AN OFFER AND THIS AGREEMENT SHALL BECOME EFFECTIVE ONLY UPON ITS EXECUTION BY YOU AND US. THIS AGREEMENT SHALL NOT BE BINDING ON US UNLESS AND UNTIL IT IS ACCEPTED BY US, THAT IS, SIGNED BY OUR AUTHORIZED OFFICER AND RETURNED TO YOU.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

RE/MAX FLORIDA REGION                           847 Realty Services, Inc.

By: _____  _____        _____ _____
                                Date            Michael A. Vale, President        Date
    Nick Bailey
Title: Regional Vice President

5075 South Syracuse Street                       847 North Collier Boulevard
Street Address                                   Street Address

Denver, CO 80237                                 Marco Island, FL 34145
City, State, Zip                                 City, State, Zip

**EXHIBIT A**
To Franchise Agreement

**OWNERSHIP INFORMATION**

**NAMES AND ADDRESSES OF SOLE PROPRIETOR, PARTNERS,
SHAREHOLDERS, MEMBERS AND DIRECTORS, AS APPLICABLE**

1.   If you are a sole proprietorship, list below the name and residence address of the sole owner:

_____

_____

_____

_____

2.   If you are a partnership, list below the names, residence addresses and respective percentage ownership interests of each partner (please identify the managing partner) and submit a copy of the partnership agreement, if any, to RE/MAX Florida Region (if more space is required, attach additional sheets hereto):

a. _____     b. _____

_____        _____

_____        _____

_____ %            _____ %

c. _____     d. _____

_____        _____

_____        _____

_____ %            _____ %

3.   If you are a corporation or limited liability company, list below the names, residence addresses and percentage ownership of each shareholder or member, as appropriate, and submit a copy of the Articles of Incorporation or Articles of Organization to RE/MAX Florida Region (if more space is required, attach additional sheets hereto):

a. Michael A. Yale             b. _____

970 Cape Marco Drive, Unit 2402    _____

Marco Island, FL 34145         _____

_____ 100%         _____ %

c. _____     d. _____

_____        _____

_____ %            _____ %

4.    If you are a corporation or limited liability company, list below the names and residence addresses of each director or manager, as appropriate (if more space is required, attach additional sheets hereto):

a. _____    b. _____
_____    _____
_____    _____
_____    _____

c. _____    d. _____
_____    _____
_____    _____
_____    _____

5.    If you are a corporation, list below the names, residence addresses and title of each officer (if more space is required, attach additional sheets hereto):

a. Michael A. Vale    b. _____
970 Cape Marco Drive, Unit 2402    _____
Marco Island, FL 34145    _____
President    _____

c. _____    d. _____
_____    _____
_____    _____
_____    _____

PLEASE PROVIDE US WITH INFORMATION SIMILAR TO THE ABOVE IF YOU ARE A BUSINESS ENTITY OTHER THAN A PARTNERSHIP, CORPORATION OR LIMITED LIABILITY COMPANY.

**EXHIBIT B**
**To Franchise Agreement**

RE/MAX International, Inc. (*"International"*) has created a Model Independent Contractor Agreement (*"ICA"*) to guide RE/MAX Regions and Franchisees in the development of an ICA that not only meets the requirements of applicable federal, state and local laws and regulations, but also defines the relationship with Sales Associates that Franchisees customarily want for their RE/MAX brokerage operations (see International's Model ICA at www.REMAXMainstreet.com).

In addition, the Model ICA satisfies the "written agreement" requirement for securing "Statutory Non-Employee" treatment of your independent contractor Sales Associates for federal tax purposes. And it lays the foundation for the way you need to treat your independent contractors to meet the other two pre-requisites for taking advantage of the "Statutory Non-Employee" safe harbor. In this way it seeks to minimize the possibility of an IRS audit of the status of your Sales Associates while giving you greater comfort in not withholding federal income taxes or contributing to FICA in respect of your independent contractor Sales Associates.

Just as important, the ICA has long been the primary writing by which RE/MAX Franchisees set up and provide a legal basis for allocating and passing on to, and collecting from, their affiliated Sales Associates the fees, dues and payment obligations RE/MAX brokers have to International under the RE/MAX System.

Finally, the ICA is the document by which you, the Broker, bring your Sales Associates under your Limited License to use the RE/MAX Marks, and it extends your use limitations to them and establishes the standards of performance and professionalism necessary to grow the goodwill embodied in the RE/MAX Marks.

RE/MAX Regions and their constituent Franchisees are free under the RE/MAX System to develop such terms of agreement and forms, including ICA forms, as they deem appropriate, so long as their approaches and activities do not undermine or adversely impact the rights and interests of the balance of the RE/MAX Organization or expose others, including International to potential liability.

To preserve the flexibility described above for those who may elect to create their own ICA rather than adapt International's Model ICA, International has identified certain essential provisions (*"Essential ICA Provisions"*) that protect and advance the interests of the entire RE/MAX Organization. You are required to include these Essential ICA Provisions, as set forth in the following pages, in every ICA you develop and use.

The Section numbers and Paragraph letters shown correlate to International's Model ICA so that you can read and interpret these Essential Provisions in the context of that Model ICA. International reserves the right to modify or amend these Essential Provisions and all future changes shall become binding upon RE/MAX Franchisees for all ICAs entered into commencing 60 days after the distribution of notice of each such change.

## ESSENTIAL ICA PROVISIONS (February 16, 2004)

Required "Essential ICA Provisions" for all Independent Contractor Agreements and Renewals after 5/1/04

2.      INDEPENDENT CONTRACTOR.

D.      <u>No Relationship with Regional or International</u>.  Contractor acknowledges that the independent contractor relationship described in this Agreement is solely between Contractor and Broker and that it is only through Broker and such relationship that Contractor is entitled to participate in the RE/MAX Network. Contractor acknowledges and agrees that no contractual relationship of any kind exists between Contractor and Regional or between Contractor and International. Contractor further acknowledges that Contractor is not an employee or an agent of Regional or of International. Contractor agrees never to claim or assert that Contractor is an employee of or an agent of Regional or of International. Contractor further agrees to look solely to Broker for performance of the terms and conditions of this Agreement. Contractor acknowledges that Regional and International are not bound by, or subject to, the terms and conditions of this Agreement.

RI/ICA "Essential Provisions"  U.S. Only  02/2004
© 1989, 1992, 1998, 2004 RE/MAX International, Inc.
All Rights Reserved

4.     CONTRACTOR'S RESPONSIBILITIES.

**B.     Authority to Establish Commissions and Required Disclosure.**  Contractor acknowledges that Broker, like any other real estate brokerage entity, comprises a single competitive unit in the name of which all Real Estate Service Agreements are to be taken.  Contractor also acknowledges that Broker has the right to determine the commissions charged on its Real Estate Service Agreements and for the services of its sales force.  Consistent with the RE/MAX System, Broker hereby authorizes Contractor to negotiate or to otherwise independently establish the commission to be paid Broker on a transaction-by-transaction basis on all agency relationships, referrals and cooperative sales procured by Contractor, but Broker reserves the right to withdraw this authorization at any time. In the interest of avoiding consumer confusion regarding the commission rates or fees available generally from RE/MAX offices, brokers and agents, Broker may discourage or prohibit the advertising of commission rates or fees by Contractor.  Contractor shall not advertise any commission rates or fees without the prior written authority of Broker, with such authority being revocable at any time. In the event that Broker authorizes the advertisement of commission rates or fees, Contractor shall assure that any advertisement of commission rates or fees by Contractor includes as a disclosure, in prominent letters no smaller than one half the font used for displaying the commission rates or fees in such advertising, the following: "*Different commission rates, fees and listing and marketing services may be offered by other RE/MAX offices and RE/MAX sales associates in this market area.*"  In addition, it shall be the responsibility of Contractor to make sure that potential clients fully understand the listing and marketing services that will be provided by Contractor in the market area in return for the commission rates or fees advertised. Contractor agrees to act strictly within the authority granted by this Subparagraph with respect to the establishment and advertising of commission rates or fees.

**I.     Adherence to Office Policies and System Quality Standards.**  Contractor shall strictly observe all office rules, procedures, standards, guidelines and policies (collectively "*Office Policies*") from time-to-time established by Broker for the operation of Broker's RE/MAX office and the conduct of its Sales Associates. Specifically, but without limitation, Contractor shall maintain the highest ethical standards in the conduct of Contractor's real estate activities, shall maintain Contractor's personal appearance and appearance of Contractor's office or work area in a clean and orderly manner and shall provide dependable, efficient, courteous, high-quality professional real estate services to the public in a manner designed to maintain goodwill among the public for the entire RE/MAX System.  In addition, Contractor shall abide by all RE/MAX System policies, guidelines and standards (*"System Standards"*) pertaining to Sales Associates affiliated with the RE/MAX Network as from time-to-time approved or prescribed by Regional and/or International.  Contractor acknowledges that Contractor's agreement to adhere to the Office Policies of Broker and the System Standards of Regional and International is a material consideration for the execution of this Agreement by Broker, and that such Office Policies and System Standards have been established for the purpose of preserving the reputation, high standards and goodwill associated with the RE/MAX Marks (as defined in Subparagraph 8.A.).  Contractor acknowledges that such System Standards do not govern the specific manner and means by which Contractor conducts Contractor's day-to-day real estate activities as an independent contractor on behalf of Broker.  Any breach of this Subparagraph 4.I. will constitute a material breach of this Agreement.

**J.     Compliance with Laws and Good Business Practices.**  Contractor shall abide by all applicable laws, ordinances and regulations including, without limitation, local, state and federal laws and regulations relating to real estate transactions and real estate service businesses.  Contractor shall also abide by the rules of ethical conduct established by the National Association of REALTORS®.  Contractor's advertising and promotion must be completely factual and conform to the highest standards of lawful, ethical advertising.  In all dealings with clients, customers, suppliers, public officials, other real estate agents and brokers and the general public, Contractor must adhere to the highest standards of business behavior, honesty, integrity, fair dealing and ethical conduct.  Contractor agrees to refrain from any business or advertising practice which may expose Broker to legal action or liability or adversely affect the reputation or image of Broker, Regional, other RE/MAX offices or RE/MAX affiliates, the RE/MAX Network, International or the goodwill associated with the RE/MAX Marks.  Any breach of this Subparagraph 4.J. will constitute a material breach of this Agreement.

**L.     Hiring of Personal Assistants and Creating Working Relationships.**  Without authority from and the prior written approval of Broker, Contractor shall not hire, employ, contract with or for, retain the services of, or arrange for any continuing working relationship with, any licensed or unlicensed personal assistant, or any licensed

RII/ICA "Essential Provisions"  U.S. Only  02/2004
© 1989, 1992, 1998, 2004 RE/MAX International, Inc.
All Rights Reserved

person, who is not affiliated with Broker nor shall Contractor hold or sponsor the license of any real estate broker or salesperson.

    **M.**    <u>REALTOR® Membership.</u> Contractor shall maintain membership in good standing in the local Association or Board of REALTORS® affiliated with the National Association of REALTORS® (**"NAR"**) having jurisdiction over the market areas served by Broker and shall abide by the Code of Ethics promulgated by NAR and all of the rules and regulations of each local or regional Multiple Listing Service (**"MLS"**) in which Broker participates.

    **P.**    <u>Identification as independent Operation.</u> Contractor agrees to indicate in all dealings with clients, customers, suppliers, public officials and others that Contractor is affiliated as an independent contractor with Broker and that Broker's office is independently owned and operated. Contractor agrees, where appropriate or required by Office Policies or System Standards, to include in all advertising placed by Contractor the statement: "Each RE/MAX office is independently owned and operated."

**8.**    **RE/MAX MARKS.**

    **A.**    <u>Ownership of RE/MAX Marks.</u> Contractor acknowledges that International is the exclusive owner of all right, title and interest in and to International's federal and state registered and common law marks, which include, without limitation, "RE/MAX", "Above the Crowd", the RE/MAX Balloon and Design, as well as the RE/MAX red-over-white-over-blue design; and various other service marks, trademarks, trade names, membership marks, certification marks, logos, slogans, designs and all federal and state registrations and applications for registrations thereof (collectively the **"RE/MAX Marks"**). Contractor further acknowledges that the RE/MAX Marks have become widely known throughout the United States and are now famous. Contractor also acknowledges that Broker has the right to use the RE/MAX Marks pursuant to, and solely in accordance with, Broker's RE/MAX Franchise Agreement with Regional.

    **B.**    <u>Permitted Uses of RE/MAX Marks.</u> Pursuant to the terms and conditions of this Agreement, Broker grants permission to Contractor to use the RE/MAX Marks, but to do so only in connection with Broker's office name and address so as to indicate that Contractor is acting as an independent contractor real estate sales associate exclusively for Broker. Contractor understands and agrees that Contractor has no independent right to use of any of the RE/MAX Marks, but rather that Contractor's use of the RE/MAX Marks comes under and is subject to the Limited License embodied in Broker's Franchise Agreement. Contractor further understands that all use by Contractor of the RE/MAX Marks inures exclusively to the benefit of International. Contractor agrees to use the RE/MAX Marks only: (1) to signify that Contractor is affiliated with, and acts on behalf of, Broker and as such, is an affiliate of the RE/MAX Network; and (2) to identify Broker as the entity on behalf of which Contractor engages in the business of procuring and performing the obligations under real estate related services contracts, including listings contracts, buyer agency agreements, property management agreements and the like. With the written permission of Broker and subject to strict compliance with the format requirements set forth in the most current edition of International's RE/MAX Trademark and Graphic Standards Manual, as amended from time-to-time, (**"Trademark Manual"**), and the ownership/assignment understandings set forth in Subparagraph 8.E. below, Contractor may be authorized to use an Internet domain name that includes the term "remax" (**"RE/MAX Formative Domain Name"**). Finally, Contractor is authorized to use the RE/MAX Marks in connection with advertising that promotes Contractor as a real estate professional affiliated with Broker and the RE/MAX Network (**"Personal Promotion Advertising"**) so long as such advertising includes Broker's name and address and meets the balance of other requirements set forth in the Trademark Manual for Personal Promotion Advertising.

    **C.**    <u>Prohibited Uses of RE/MAX Marks and Broker's Name.</u> Contractor is not authorized to and shall refrain from using Broker's name or the RE/MAX Marks: (i) in connection with any business other than the real estate brokerage business of Broker; (ii) in conjunction with the name or photo of any licensed person who is not affiliated as a Sales Associate with Broker; (iii) in the name of any "team" of agents or of any entity, group, network or association other than the RE/MAX Network; (iv) in the name of or in connection with activities comprising a RE/MAX office/agent locator service as defined in the Trademark Manual; (v) in the name of or in connection with activities comprising a private referral network as defined in the Trademark Manual; (vi) in conjunction with any third party service that competes directly with a service offered by Regional or International, to the public, or affiliates of the RE/MAX Network; (vii) in any RE/MAX Formative Domain Name that has not been authorized by

RII/ICA "Essential Provisions"   U.S. Only   02/2004<br>© 1989, 1992, 1998, 2004 RE/MAX International, Inc.<br>All Rights Reserved

Broker pursuant to Subparagraph 8.B. above or that does not comply strictly with the Trademark Manual; (viii) in any telephone directory or other directory listing or in any advertising, including without limitation, yellow pages display advertising, that does not comply with the Trademark Manual or with the Image, Advertising & Communications Guidelines of International as from time-to-time amended; (ix) on or in connection with any Internet website that functions for any purpose other than the promotion of the real estate business of Broker or that does not include the name and address of Broker; (x) in connection with the offering of real estate related services in market areas that Contractor does not serve personally and directly; (xi) in connection with any real estate related services that do not meet the standards of quality and professionalism in Contractor's market area; or (xii) in any other manner not approved by Broker or that is not in compliance with, or is prohibited by, the Trademark Manual or the most current version of the Image, Advertising and Communications Guidelines as from time-to-time amended by International (*"Image, Advertising and Communications Guidelines"*). The term "System Standards" shall be deemed to include the Trademark Manual and the Image, Advertising and Communications Guidelines.

   D.   <u>No Uses By or In Support of Third Party's Services or Programs</u>.  Contractor is not authorized to and shall refrain from entering into any relationship with, or sponsorship or endorsement arrangement concerning, any third party individual or entity where such relationship results in, involves, or purports to permit, the use or display by such third party of Broker's name, or any of the RE/MAX Marks, or any other name that is associated with Broker's name, in connection with the offering or promotion of such third party's products, services, programs, beliefs or causes.

   E.   <u>Ownership and Assignment of RE/MAX Formative Domain Names</u>.  Contractor acknowledges and agrees that the ownership of all RE/MAX Formative Domain Names as between Broker and Contractor shall be determined by Broker or the Office Policies of Broker. Contractor agrees not to assign or encumber in any way the ownership or control rights of, or any interest respecting, any RE/MAX Formative Domain Name that Contractor owns or controls, to any person or entity other than Broker.

   F.   <u>No Other Uses of Broker's Name or RE/MAX Marks Permitted</u>.  Except as expressly permitted under this Paragraph 8, Contractor will not use Broker's name or the RE/MAX Marks in any manner whatsoever. Under no circumstances is Contractor permitted to authorize any other real estate license holder to use Broker's name or the RE/MAX Marks on business cards or in advertising or promotional materials of any kind or to allow such license holder to appear in name and/or image with or under the RE/MAX Marks or to otherwise benefit from them or Broker's name.

   G.   <u>Compliance with Trademark Manual</u>.  Contractor agrees that all use or display of the RE/MAX Marks by Contractor as permitted by this Paragraph 8 shall conform to the manner prescribed by International in the then most recent edition of the "Trademark Manual" and fully comply with all other standards and guidelines set forth in such manual.

   H.   <u>Material Breaches and Third Party Beneficiaries</u>.  Any breach of any Subparagraph of this Paragraph 8 shall constitute a material breach of this Agreement. Contractor acknowledges and agrees that Regional and International are third party beneficiaries of this Paragraph 8 and, accordingly, Regional and/or International may bring an action directly to enforce the provisions of this Paragraph.

   I.   <u>Indemnification for Costs of Forced Compliance</u>.  Contractor agrees to indemnify Broker, Regional and/or International for all costs incurred, including court costs, expert witness fees, consumer survey costs and reasonable attorney fees, by Broker, Regional and/or International to secure full compliance with the provisions of this Paragraph 8.

9.   DISPUTE RESOLUTION.

   A.   <u>Reporting of Problems and Complaints</u>.  Contractor shall promptly report to Broker or Broker's broker of record, office manager or other person designated by Broker all problems, complaints and other circumstances, related to Contractor's conduct, activities or services which may lead to claims, disputes or controversies. Any failure by Contractor to report promptly such problems, complaints or other circumstances, or to cooperate fully with Broker in accordance with this Paragraph 9, shall be grounds for immediate termination of this Agreement by Broker for cause.

RII/ICA "Essential Provisions"  U.S. Only  02/2004                    4
© 1989, 1992, 1998, 2004 RE/MAX International, Inc.
All Rights Reserved

B.    Agreement to Mediate and Arbitrate Disputes. Except as provided in Paragraph 9.D. below, Contractor hereby agrees to cooperate with Broker by supporting and fully participating in all efforts to resolve disputes, complaints and other problems (hereafter collectively called "Dispute(s)") that arise: (i) out of this Agreement; (ii) out of Contractor's conduct, activities or services as a real estate licensee; (iii) out of any transaction in which Contractor is involved, or (iv) out of Contractor's relationship with the RE/MAX Network or any RE/MAX affiliate (including, without limitation, Broker or any other RE/MAX office, Regional or any other RE/MAX region, International, any other RE/MAX Sales Associate or any officers, shareholders, directors, employees, agents or affiliates of any of the foregoing). Contractor agrees to cooperate in the resolution of such Disputes through mediation and, if not successfully resolved, then through binding arbitration in accordance with the provisions of Subparagraph 9.C. below. Contractor makes the foregoing commitment with full knowledge that by agreeing to submit Disputes to binding arbitration, Contractor is agreeing not to resort to the courts or the judicial system and waiving Contractor's rights to do so. If any other necessary party to any Dispute refuses to arbitrate and is not bound by agreement to do so or cannot be compelled to do so on other grounds, or if Broker and Contractor working in cooperation cannot persuade other necessary parties to agree on a mediation and arbitration system, then the foregoing commitment by Contractor to mediate and/or arbitrate that particular Dispute shall be of no force or effect.

C.    Dispute Resolution Procedure. Where Regional has adopted and fully implemented the RE/MAX Dispute Resolution System ("*RDRS*") as prescribed and from time-to-time amended by RE/MAX International, Inc., all qualifying Disputes shall be submitted for resolution in accordance with that system. Regional reserves the right to determine, in its sole discretion, whether or not a Dispute qualifies for resolution under the RDRS and reserves the right to decline the administration of any Dispute it determines is not appropriate for resolution under the RDRS. If Regional has not adopted the RDRS or not fully implemented the RDRS, or if the Dispute does not qualify for resolution under the RDRS, the Dispute shall be submitted to an alternative mediation and arbitration system mutually acceptable to the parties to the Dispute. If the parties cannot agree on an alternative mediation and arbitration system, then the Dispute shall be submitted to the American Arbitration Association ("*AAA*") for mediation and, if unsuccessful, for binding arbitration, in accordance with AAA's Commercial Medication Rules or Commercial Arbitration Rules, as applicable.

D.    Exceptions to Mediation and Arbitration. Notwithstanding the obligation of Contractor to arbitrate or mediate as set forth in this Paragraph 9, neither Contractor, Broker, Regional nor RE/MAX International, Inc., shall be required to mediate or arbitrate Disputes, or any other matters or claims, that relate in any way to the RE/MAX Marks, the use of the RE/MAX name or to copyrights, trade secrets, or other proprietary rights owned by Regional or International, or to the System Standards including, without limitation, the Trademark Manual and the Distinguishing Characteristics, Materials, and Confidential Information (as defined in Paragraph 12) or relating to the restrictions on subsequent business activities set forth in Paragraph 12 of this Agreement or the enforcement of any such restrictions. This Paragraph 9 shall not preclude, or be construed to require mediation or arbitration of, any demand or legal action, in law or equity, seeking to enforce the de-identification provisions of Subparagraph 12.D. or the termination of this Agreement on any grounds that would permit immediate termination for cause.

11.    TERMINATION.

A.    By Broker for Cause. If Contractor commits a material breach of this Agreement, Broker may terminate this Agreement immediately and without prior notice and pursue any and all remedies for the material breach that are available to Broker at law or in equity.

12.    RESTRICTIONS ON SUBSEQUENT BUSINESS ACTIVITY.

A.    Materials. Contractor acknowledges that the sales plans, programs, manuals, rosters, forms, contracts, agreements, brochures and other training, listing and sales materials provided hereunder by, and the information gained from, the files or business of Broker, Regional or International, irrespective of the origin or ultimate source (collectively, the "*Materials*"), are and shall remain the exclusive property of their source, be it Broker, Regional and/or International. Upon termination or expiration of this Agreement, without Renewal or Extension, Contractor shall promptly return to Broker the original and all copies of the Materials in Contractor's possession and shall not, after such termination or expiration use any aspect of the Materials for any reason, or

permit, suffer or tolerate the use of the Materials for Contractor's own advantage or the advantage of others.

B.     **Confidential Information.**   Contractor acknowledges that Contractor has obtained and/or will obtain knowledge of confidential matters, trade secrets, techniques, accounting procedures and other methods developed by, through and in the RE/MAX System which are owned by International, and are essential to the operation of the RE/MAX System (collectively, the *"Confidential Information")*, without which Contractor could not as efficiently, as effectively or as profitably operate or conduct Contractor's RE/MAX affiliated real estate service activities.   Contractor further acknowledges that the Confidential Information was unknown to Contractor prior to Contractor's affiliation with the RE/MAX Network, and that the methods developed by and for the RE/MAX System are unique and novel.   Contractor shall take all necessary steps, at Contractor's own expense, to protect the Confidential Information and shall not divulge the Confidential Information, either during the term of this Agreement or following termination or expiration of this Agreement or any Renewal or Extension, without the prior written consent of International.

C.     **Distinguishing Characteristics of RE/MAX System.**   Contractor acknowledges the exclusive rights of International to its real estate system, its method of operation and its distinguishing characteristics, including but not limited to the RE/MAX Marks, slogans, advertising copy and other distinguishing characteristics now or hereafter adopted, displayed, used, existing as part of or becoming a part of the RE/MAX System (collectively, the *"Distinguishing Characteristics")*.   The Distinguishing Characteristics presently include, but are not limited to, the horizontal red-over-white-over-blue design on RE/MAX signs, business cards, telephone numbers, "REMAX" Formative Domain Names, RE/MAX hot air balloons and other materials identified with the RE/MAX System. After termination or expiration of this Agreement without Renewal or Extension, Contractor shall not use or imitate the RE/MAX System or any of the Distinguishing Characteristics and shall destroy or return to Broker all signs, cards, stationery and any other RE/MAX material in Contractor's possession upon such termination or expiration. After termination or expiration of this Agreement without Renewal or Extension, Contractor shall assign to Broker any (i) "REMAX" Formative Domain Names owned, held or controlled by Contractor; and (ii) telephone numbers promoted in connection with Contractor's use of the RE/MAX marks.

D.     **De-Identification.**   Following termination or expiration of this Agreement without Renewal or Extension or of Contractor's affiliation with the RE/MAX Organization upon any other event, Contractor shall be free to continue Contractor's real estate business with competing real estate operations or to establish Contractor's own brokerage operation or other business alone or in concert with others.   However, in connection with any business hereafter carried on by Contractor, Contractor shall refrain from all use of the Materials, the Confidential Information, the RE/MAX Marks, and the Distinguishing Characteristics and shall refrain from all representations, advertisements, actions and business activities that may mislead others in the real estate business and/or the public to believe Contractor is still a part of, affiliated with or sponsored in some way by the RE/MAX Network.   In addition, Contractor shall not adopt or use any name, trademark, service mark, sign design, logo or other device that comprises the colors blue, red and white or which may (i) likely cause consumer confusion, or (ii) likely dilute the distinctiveness of the RE/MAX Marks or the Distinguishing Characteristics.   Specifically, but without limitation, Contractor shall not adopt or use the term RE/MAX in connection with, or in the name of, any subsequent business or use any term confusingly similar to the term RE/MAX or any name or term with the prefix "RE" or the suffix "MAX", and Contractor shall refrain from the use of the colors red, white and blue in any three-color identity scheme, from the use of the red over white over blue design or any horizontal bar design in the same or similar colors or that is otherwise confusingly similar thereto, from the use of a hot air balloon or a hot air balloon symbol, and from the use of the term "Above the Crowd" or any other three-word phrase beginning with "Above" or ending with "Crowd."

E.     **Applicability of Prohibitions.**   The prohibitions upon termination or expiration of this Agreement as set forth in Subparagraphs 12.A. through 12.D., shall not affect the rights and privileges which may be conferred upon Contractor by any contract establishing an affiliation with another RE/MAX franchisee subsequent to such termination or expiration.

F.     **Enforcement; Injunctive Relief; Attorneys' Fees.**   Contractor hereby acknowledges and agrees that it would be difficult to measure the economic loss that would occur as a result of the breach of any of the provisions of this Paragraph 12, and that such a breach would cause immediate and irreparable harm for which there would be no adequate remedy at law.   Contractor further acknowledges and agrees that any of the foregoing provisions may

© 1989, 1992, 1998, 2004 RE/MAX International, Inc.
All Rights Reserved

be enforced by injunction and/or restraining order.  Further, Contractor acknowledges and agrees that International, as the owner of federal and state registrations for and common law rights in the RE/MAX Marks, shall have a direct right to enforce any of the provisions contained in this Paragraph 12 through appropriate legal proceedings. Contractor agrees that Broker may transfer to Regional, Regional's and/or International the right to pursue, in Broker's, Regional's and/or International's name, any claim (including without limitation a breach of contract claim) against Contractor for breach of any term or condition contained in this Paragraph 12 and Contractor further agrees not to contest any such transfer in any legal proceeding.  If Broker, Regional and/or International, is required to retain an attorney to enforce any of the provisions of this Paragraph 12 or to institute legal proceedings incident to such enforcement, Contractor shall pay, in addition to all other sums for which Contractor may be found liable, reasonable attorneys' fees, court costs and litigation expenses incurred by Broker, Regional and/or International.

G.      <u>Third Party Beneficiaries</u>.  Regional and International, shall be deemed third party beneficiaries of the acknowledgements, agreements and provisions of this Paragraph 12 including, without limitation, for purposes of protection of the RE/MAX System, the Materials, the Confidential Information, the RE/MAX Marks and the Distinguishing Characteristics.

- END -

**EXHIBIT 2**

Int. Cls.: 35 and 36

Prior U.S. Cl.: 101

**United States Patent and Trademark Office**      Reg. No. 1,139,014
                                                    Registered Aug. 26, 1980

**SERVICE MARK**
**Principal Register**

**RE/MAX**

Re/Max of America, Inc. (Colorado corporation)
5555 S. Trenton Way
Englewood, Colo.   80110

For: RENDERING TECHNICAL AID AND ASSIST-
ANCE TO OTHERS IN THE ESTABLISHMENT AND
OPERATION OF A REAL ESTATE BROKERAGE
AGENCY, in CLASS 35 (U.S. CL. 101).
   First use Jan. 30, 1973; in commerce Jun. 1, 1973.
   For: REAL ESTATE BROKERAGE SERVICES, in
CLASS 36 (U.S. CL. 101).
   First use Jan. 30, 1973; in commerce Jun. 1, 1973.

   Ser. No. 113,283, Filed Jan. 21, 1977.

MARC BERGSMAN, Primary Examiner

Int. Cls.: 35 and 36

Prior U.S. Cls.: 101 and 102

## United States Patent and Trademark Office

Reg. No. 1,702,048
Registered July 21, 1992

## SERVICE MARK
### PRINCIPAL REGISTER



RE/MAX INTERNATIONAL, INC. (COLORADO CORPORATION)
SUITE 1200
5445 DTC PARKWAY
ENGLEWOOD, CO 80111

FOR: FRANCHISING SERVICES, NAMELY, OFFERING TECHNICAL ASSISTANCE IN THE ESTABLISHMENT AND/OR OPERATION OF REAL ESTATE AND INSURANCE BROKERAGE FIRMS, IN CLASS 35 (U.S. CL. 101).

FIRST USE 1-1-1974; IN COMMERCE 1-1-1974.

FOR: REAL ESTATE BROKERAGE AND INSURANCE BROKERAGE SERVICES, IN CLASS 36 (U.S. CLS. 101 AND 102).

FIRST USE 1-1-1974; IN COMMERCE 1-1-1974.

OWNER OF U.S. REG. NOS. 1,139,014, 1,158,371, AND 1,173,586.

THE DRAWING IS LINED FOR COLOR TO SHOW THE TOP RECTANGULAR BAR TO BE RED AND THE BOTTOM RECTANGULAR BAR TO BE BLUE.

THE MIDDLE BAR IS WHITE AND IS BOUNDED ON THE LEFT AND RIGHT BY DOTTED LINES TO SHOW ITS LOCATION. SUCH DOTTED LINES ARE NOT PART OF THE MARK AND NO CLAIM IS MADE TO SUCH DOTTED LINES.

SER. NO. 73-839,624, FILED 11-15-1989.

LINDA E. BOHANNON, EXAMINING ATTORNEY

Int. Cls.: 35 and 36

Prior U.S. Cls.: 101 and 102

**United States Patent and Trademark Office**

Reg. No. 1,173,586
Registered Oct. 13, 1981

### SERVICE MARK
Principal Register



Re/Max of America, Inc. (Colorado corporation)
7935 E. Prentice Ave.
Englewood, Colo. 80111

For: RENDERING OF TECHNICAL ASSIS-
TANCE TO OTHERS IN ESTABLISHMENT, OP-
ERATION AND/OR PROMOTION OF REAL
ESTATE BROKERAGE OFFICES, in CLASS 35
(U.S. Cl. 101).
First use Aug. 9, 1979; in commerce Aug. 9, 1979.

For: REAL ESTATE BROKERAGE SER-
VICES, in CLASS 36 (U.S. Cls. 101 and 102).
First use Oct. 7, 1978; in commerce Oct. 7, 1978.
The drawing is lined for the colors red and blue.

Ser. No. 265,471, filed Jun. 9, 1980.

MARTIN MARKS, Primary Examiner

Int. Cl.: 36

Prior U.S. Cl.: 102

Reg. No. 1,339,510

## United States Patent and Trademark Office

Registered June 4, 1985

### SERVICE MARK
### PRINCIPAL REGISTER

### RE/MAX

RE/MAX OF AMERICA, INC. (COLORADO
   CORPORATION)
5251 S. QUEBEC
ENGLEWOOD, CO 80111

   FOR: INSURANCE BROKERAGE SERVICES,
IN CLASS 36 (U.S. CL. 102).

FIRST USE 4-1-1980; IN COMMERCE
4-1-1980.
   OWNER OF U.S. REG. NO. 1,139,014.

SER. NO. 510,503, FILED 11-26-1984.

SHARON R. MARSH, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cl.: 102

# United States Patent and Trademark Office

Reg. No. 1,358,422
Registered Sep. 3, 1985

## SERVICE MARK
### PRINCIPAL REGISTER



RE/MAX OF AMERICA, INC. (COLORADO CORPORATION)
5251 SOUTH QUEBEC
ENGLEWOOD, CO 80111

FOR: INSURANCE BROKERAGE SERVICES, IN CLASS 36 (U.S. CL. 102).
FIRST USE 4-1-1980; IN COMMERCE 4-1-1980.
OWNER OF U.S. REG. NOS. 1,139,014 AND 1,173,586.

THE MARK IS LINED FOR THE COLORS RED AND BLUE BUT THESE COLORS ARE NOT A FEATURE OF THE MARK. THE STIPPLING IS FOR SHADING PURPOSES ONLY AND DOES NOT INDICATE COLOR.

SER. NO. 509,722, FILED 11-20-1984.

SHARON R. MARSH, EXAMINING ATTORNEY

Int. Cls.: 35 and 36

Prior U.S. Cls.: 101 and 102

**United States Patent and Trademark Office**     Reg. No. 1,691,854
                                                  Registered June 9, 1992

## SERVICE MARK
## PRINCIPAL REGISTER



RE/MAX INTERNATIONAL, INC. (COLORADO CORPORATION)
SUITE 1200
5445 DTC PARKWAY
ENGLEWOOD, CO 80111

FOR: FRANCHISING SERVICES; NAMELY, OFFERING TECHNICAL ASSISTANCE IN THE ESTABLISHMENT AND/OR OPERATION OF REAL ESTATE AND INSURANCE BROKERAGE FIRMS, IN CLASS 35 (U.S. CL. 101).

FIRST USE 10-7-1979; IN COMMERCE 10-7-1979.

FOR: REAL ESTATE BROKERAGE AND INSURANCE BROKERAGE SERVICES, IN CLASS 36 (U.S. CL. 102).

FIRST USE 10-7-1979; IN COMMERCE 10-7-1979.

OWNER OF U.S. REG. NOS. 1,139,014, 1,158,371, AND 1,173,586.

SER. NO. 73-839,631, FILED 11-15-1989.

LINDA E. BOHANNON, EXAMINING ATTORNEY

Int. Cls.: 35 and 36

Prior U.S. Cls.: 101 and 102

# United States Patent and Trademark Office

Reg. No. 1,720,592
Registered Sep. 29, 1992

## SERVICE MARK
## PRINCIPAL REGISTER



RE/MAX INTERNATIONAL, INC. (COLORADO CORPORATION)
SUITE 1200
5445 DTC PARKWAY
ENGLEWOOD, CO 80111

FOR: FRANCHISING SERVICES; NAMELY, OFFERING TEHNCICAL ASSISTANCE IN THE ESTABLISHMENT AND/OR OPERATION OF REAL ESTATE AND INSURANCE BROKERAGE FIRMS, IN CLASS 35 (U.S. CL. 101).

FIRST USE 10-7-1979; IN COMMERCE 10-0-1979.

FOR: REAL ESTATE BROKERAGE AND INSURANCE BROKERAGE SERVICES, IN CLASS 36 (U.S. CLS. 101 AND 102).

FIRST USE 10-7-1979; IN COMMERCE 10-0-1979.

THE DRAWING IS LINED FOR COLOR TO SHOW THE TOP RECTANGULAR BAR TO BE RED AND THE BOTTOM RECTANGULAR BAR TO BE BLUE. THE MIDDLE BAR IS WHITE AND IS BOUNDED ON THE LEFT AND RIGHT BY DOTTED LINES TO SHOW ITS LOCATION. THE DOTTED LINES ARE NOT PART OF THE MARK AND NO CLAIM IS MADE TO SUCH DOTTED LINES.

SER. NO. 73-839,632, FILED 11-15-1989.

LINDA E. BOHANNON, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 101 and 102

**United States Patent and Trademark Office**

Reg. No. 1,900,865
Registered June 20, 1995

### SERVICE MARK
### PRINCIPAL REGISTER



RE/MAX INTERNATIONAL, INC. (COLORADO CORPORATION)
5445 DTC PARKWAY, SUITE 1200
ENGLEWOOD, CO 80111

FOR: REAL ESTATE BROKERAGE SERVICES, IN CLASS 36 (U.S. CLS. 101 AND 102).

FIRST USE 8-9-1979; IN COMMERCE 8-9-1979.
OWNER OF U.S. REG. NOS. 1,173,586, 1,720,592 AND OTHERS.

SER. NO. 74-459,509, FILED 11-18-1993.

JEFFREY LOOK, EXAMINING ATTORNEY

Int. Cl.: 35

Prior U.S. Cl.: 101

## United States Patent and Trademark Office

Reg. No. 1,902,943
Registered July 4, 1995

## SERVICE MARK
### PRINCIPAL REGISTER



RE/MAX INTERNATIONAL, INC. (COLORADO CORPORATION)
5445 DTC PARKWAY, SUITE 1200
ENGLEWOOD, CO 80111

FOR: FRANCHISE SALES AND SUPPORT SERVICES; NAMELY, OFFERING TECHNICAL ASSISTANCE IN THE ESTABLISHMENT AND/OR OPERATION OF REAL ESTATE BROKERAGE SERVICES, IN CLASS 35 (U.S. CL. 101).

FIRST USE 8-9-1979; IN COMMERCE 8-9-1979.

OWNER OF U.S. REG. NOS. 1,173,586, 1,720,592 AND OTHERS.

SER. NO. 74-459,510, FILED 11-18-1993.

JEFFREY LOOK, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 101 and 102

## United States Patent and Trademark Office

Reg. No. 1,902,982
Registered July 4, 1995

### SERVICE MARK
### PRINCIPAL REGISTER



RE/MAX INTERNATIONAL, INC. (COLORADO CORPORATION)
5445 DTC PARKWAY, SUITE 1200
ENGLEWOOD, CO 80111

FOR: REAL ESTATE BROKERAGE SERV-ICES, IN CLASS 36 (U.S. CLS. 101 AND 102). FIRST USE 8-9-1979; IN COMMERCE 8-9-1979.

OWNER OF U.S. REG. NOS. 1,113,586, 1,720,592 AND OTHERS.

THE DRAWING IS LINED FOR COLOR TO SHOW THE TOP PORTION OF THE BALLOON RED AND THE LOWER PORTION OF THE BALLOON BLUE. THE MIDDLE PORTION OF THE BALLON IS WHITE. THE MIDDLE POR-TION IS BOUNDED ON THE LEFT AND RIGHT BY DOTTED LINES TO SHOW ITS LO-CATION. SUCH DOTTED LINES ARE NOT PART OF THE MARK AND NO CLAIM IS MADE TO SUCH DOTTED LINES.

SER. NO. 74-459,511, FILED 11-18-1993.

JEFFREY LOOK, EXAMINING ATTORNEY

Int. Cl.: 35

Prior U.S. Cl.: 101

## United States Patent and Trademark Office

Reg. No. 1,908,724
Registered Aug. 1, 1995

### SERVICE MARK
### PRINCIPAL REGISTER



RE/MAX INTERNATIONAL, INC. (COLORADO CORPORATION)
5445 DTC PARKWAY, SUITE 1200
ENGLEWOOD, CO 80111

FOR: FRANCHISE SALES AND SUPPORT SERVICES; NAMELY, OFFERING TECHNICAL ASSISTANCE IN THE ESTABLISHMENT AND/OR OPERATION OF REAL ESTATE BROKERAGE SERVICES, IN CLASS 35 (U.S. CL. 101).

FIRST USE 8-9-1979; IN COMMERCE 8-9-1979.

OWNER OF U.S. REG. NOS. 1,173,586, 1,720,592 AND OTHERS.

THE DRAWING IS LINED FOR COLOR TO SHOW THE TOP PORTION OF THE BALLOON RED AND THE LOWER PORTION OF THE BALLOON BLUE. THE MIDDLE PORTION OF THE BALLON IS WHITE. THE MIDDLE PORTION IS BOUNDED ON THE LEFT AND RIGHT BY DOTTED LINES TO SHOW ITS LOCATION. SUCH DOTTED LINES ARE NOT PART OF THE MARK AND NO CLAIM IS MADE TO SUCH DOTTED LINES.

SER. NO. 74-459,508, FILED 11-18-1993.

JEFFREY LOOK, EXAMINING ATTORNEY

Int. Cl.: 35

Prior U.S. Cls.: 100, 101 and 102

Reg. No. 2,054,698

## United States Patent and Trademark Office   Registered Apr. 22, 1997

### SERVICE MARK
### PRINCIPAL REGISTER

## REMAX

RE/MAX INTERNATIONAL, INC. (COLORADO
CORPORATION)
5445 DTC PARKWAY, SUITE 1200
ENGLEWOOD, CO 80111

FOR: FRANCHISE SERVICES, NAMELY, OF-
FERING TECHNICAL ASSISTANCE IN THE
ESTABLISHMENT AND/OR OPERATION OF
REAL ESTATE BROKERAGE FIRMS, IN
CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 1-1-1977; IN COMMERCE
1-1-1977.

OWNER OF U.S. REG. NOS. 1,139,014 AND
1,173,586.

SER. NO. 75-068,927, FILED 3-7-1996.

RUSS HERMAN, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101 and 102

**United States Patent and Trademark Office**

Reg. No. 2,106,387

Registered Oct. 21, 1997

### SERVICE MARK
### PRINCIPAL REGISTER

## REMAX

RE/MAX INTERNATIONAL, INC. (COLORADO CORPORATION)
5445 DTC PARKWAY, SUITE 1200
ENGLEWOOD, CO 80155

FOR: REAL ESTATE BROKERAGE SERV-ICES, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 1-1-1977; IN COMMERCE 1-1-1977.
OWNER OF U.S. REG. NO. 1,339,510.

SER. NO. 75-068,799, FILED 3-7-1996.

RUSS HERMAN, EXAMINING ATTORNEY

Int. Cls.: 35 and 36

Prior U.S. Cls.: 100, 101 and 102

United States Patent and Trademark Office

Reg. No. 2,119,607
Registered Dec. 9, 1997

## SERVICE MARK
### PRINCIPAL REGISTER

RE/MAX

RE/MAX INTERNATIONAL, INC. (COLORADO
    CORPORATION)
5445 DTC PARKWAY, SUITE 1200
ENGLEWOOD, CO 80111

FOR: FRANCHISE SALES AND SUPPORT
SERVICES, NAMELY, OFFERING TECHNICAL
ASSISTANCE IN THE ESTABLISHMENT AND/
OR OPERATION OF REAL ESTATE BROKER-
AGE SERVICES , IN CLASS 35 (U.S. CLS. 100,
101 AND 102).

FIRST    USE   1-30-1973;   IN   COMMERCE
6-1-1973.
    FOR:  REAL  ESTATE  BROKERAGE  SERV-
ICES, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).
    FIRST    USE   1-30-1973;   IN   COMMERCE
6-1-1973.
    OWNER OF U.S. REG. NOS. 1,139,014, 1,720,592
AND OTHERS.

SER. NO. 75-198,750, FILED 11-15-1996.

J. TINGLEY, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101 and 102

## United States Patent and Trademark Office

Reg. No. 2,403,626
Registered Nov. 14, 2000

### SERVICE MARK
### PRINCIPAL REGISTER

## RE/MAX

RE/MAX INTERNATIONAL, INC. (COLORADO COR-
PORATION)
8390 EAST CRESCENT PARKWAY, SUITE 600
GREENWOOD VILLAGE, CO 80111

FOR: PROVIDING A WEBSITE ON GLOBAL COM-
PUTER NETWORKS FEATURING INFORMATION IN
THE FIELD OF REAL ESTATE, IN CLASS 36 (U.S.
CLS. 100, 101 AND 102).

FIRST USE 8-1-1995; IN COMMERCE 8-1-1995.

OWNER OF U.S. REG. NOS. 1,139,014, 2,119,607
AND OTHERS.

SER. NO. 75-712,611, FILED 5-24-1999.

CAROLINE WEIMER, EXAMINING ATTORNEY